No. 25-1413

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

Trudy B. Grant, Sarah Krawcheck, Nashonda Hunter, Max Milliken, and Caleb Clark,

Plaintiffs-Appellants,

and

Jordan Mapp,

Plaintiff,

v.

Howard Knapp, as the Executive Director of the South Carolina Election Commission, Joanne Day, as a Member of the South Carolina Election Commission, Clifford J. Edler, as a Member of the South Carolina Election Commission, Linda McCall, as a Member of the South Carolina Election Commission, Scott Moseley, as a Member of the South Carolina Election Commission, Charleston County Board of Elections and Voter Registration, Dennis Shedd, Chairman of the South Carolina State Election Commission,

Defendants-Appellees.

On Appeal from the United States District Court for the District of South Carolina, Charleston Division.

APPELLANTS' BRIEF

| | |
|---|---|
| _s/Armand Derfner_______________<br>Derfner & Altman, LLC<br>Armand Derfner, Fed. ID No. 528<br>Jonathan S. Altman, Fed. ID No. 5796<br>575 King Street, Suite B<br>Charleston, SC 29403<br>aderfner@derfneraltman.com<br>jaltman@derfneraltman.com<br>Telephone: (843) 723-9804<br><br>Susan K. Dunn, Fed. ID No. 647<br>37 Charlotte Street, Suite B<br>Charleston, SC 29403<br>susandunn1950@gmail.com<br>Telephone: (843) 830-1571<br><br>Chad W. Dunn, Esq. (Pro Hac Vice)<br>Brazil & Dunn, LLP<br>1900 Pearl Street<br>Austin, TX 78705<br>chad@brazilanddunn.com<br>Telephone: (512) 717-9822<br><br>Pamela S. Karlan<br>559 Nathan Abbott Way<br>Stanford, CA 94305<br>karlan@stanford.edu<br>Telephone: (650) 725-4851<br><br>*Attorneys for Plaintiffs/Appellants* | |

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 25-1413 Caption: Trudy B. Grant, et al. v. Howard Knapp, as Exec. Dir. of the SCEC, et

Pursuant to FRAP 26.1 and Local Rule 26.1,

Trudey B. Grant, Sarah Krawcheck, Nashonda Hunter, Max Milliken and Caleb Clark
(name of party/amicus)

who is Appellants, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2. Does party/amicus have any parent corporations? ☐ YES ☑ NO
If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐ YES ☑ NO
If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: s/Armand Derfner Date: 06/02/2025

Counsel for: Appellants



Print to PDF for Filing

TABLE OF CONTENTS


TABLE OF AUTHORITIES ....................................................................i.
JURISDICTIONAL STATEMENT ....................................................................1
STATEMENT OF ISSUES ....................................................................1
STATEMENT OF THE CASE ....................................................................1

A. The Twenty-Sixth Amendment ....................................................................2

B. Absentee voting in the United States ....................................................................4

C. The South Carolina statute at issue here ....................................................................5

D. Proceedings below ....................................................................5

SUMMARY OF ARGUMENT ....................................................................7

ARGUMENT ....................................................................10

**I. SECTION 7-15-320(B)(2) VIOLATES THE TWENTY-SIXTH AMENDMENT...10**

**A. The words "deny or abridge" in the Twenty-Sixth Amendment prohibit any different treatment of voters on account of age....................................11**

1. Text of the Twenty-Sixth Amendment ....................................................................11

2. Drafting history of "deny or abridge" in the Twenty-Sixth Amendment ......12

3. Enforcement history of the prior enfranchising amendments ...............13

4. Court decisions soon after the Twenty-Sixth Amendment was ratified ......16

**B. The "right to vote" includes absentee voting ....................................................................18**

1. Drafting history of the words "right to vote" in the Twenty-Sixth Amendment ....................................................................19

2. The public meaning of the "right to vote" in 1971, based on federal law, explicitly included absentee voting ....................................................................20

3. The Supreme Court's decision in *Oregon v. Mitchell* confirms that absentee voting is an integral part of the "right to vote." ....................................................................21

4. The scope of the "right to vote" must reflect the way citizens actually cast their votes....................................................................22

**C. The district court erred by misinterpreting a Supreme Court decision and following erroneous decisions of two circuit courts ....................................23**

1. The Fifth Circuit erroneously adopted an untenable definition of "abridge" that requires retrogression ....................................................................23

2. The Seventh Circuit's 2020 decision erred in holding that the absentee voting does not implicate the "right to vote" at all ....................................................................25

3. The Seventh Circuit's 2023 decision erroneously injected a significant burden test into the Twenty-Sixth Amendment ....................................................................28

4. The district court's decision here compounded the errors of the Fifth and Seventh Circuits ..... 29

**II. THE FACIAL AGE-BASED CLASSIFICATION IN SECTION 7-15-320(B)(2) VIOLATES THE FOURTEENTH AMENDMENT'S EQUAL PROTECTION CLAUSE** ..... 30

**A. Strict scrutiny applies to voting law that discriminates on account of age** ..... 31

**B. Section 7-15-320(B)(2) fails strict scrutiny** ..... 32

**III. THIS COURT SHOULD REMAND THIS CASE FOR REMEDIAL PROCEEDINGS** ..... 33

CONCLUSION ..... 34

# TABLE OF AUTHORITIES

## CASES


1. *American Party of Texas v. White*, 415 U.S. 767 (1974) ..............................26
2. *Brnovich v. Democratic Natl Comm.*, 594 U.S. 647 (2021) ..............................32
3. *Ariz. State Legislature v. Arizona Indep. Redistrictive Comm'n.*, 576 U.S. 787 (2015)...11
4. *Brown v. Post*, 279 F.Supp. 60 (W.D.La. 1968) ..............................15
5. *Colorado Project-Common Cause v. Anderson*, 495 P.2d 220 (Colo. 1971)..............18
6. *Guinn v. United States*, 238 U.S. 347 (1915) ..............................13
7. *Harman v. Forssenius*, 380 U.S. 528 (1965) ..............................14 & 27
8. *Harper v. Virginia State Bd of Elections*, 383 U.S. 663 (1966) ..............................30
9. *Jolicoeur v. Mihaly*, 488 P.2d 1 (Cal. 1971) ..............................17
10. *Lane v. Wilson*, 307 U.S. 268 (1939) ..............................13, 15 & 17
11. *Lee v. Virginia State Bd. of Elections, 843 F3d 592 (4th Cir. 2016)* ..............................6 & 11
12. *McDonald v. Board of election Commissioner, 394 U.S. 802 (1969)*......6, 9, 22, 25 & 26
13. *Morissette v. United States, 342 U.S. 246 (1952)* ..............................11
14. *Oregon v. Mitchell, 400 U.S. 112 (1970)* ..............................3, 9, 18, 19 & 21
15. *Ownby v. Dies*, 337 F.Supp.38 (E.D.Tex. 1971) ..............................16
16. *Reno v. Bossier Parish School Bd.*, 528 U.S. 320 (2000) ..............................13 & 23
17. *Rice v. Cayetano, 528 U.S. 495 (2000)* ..............................16
18. *Saenz v. Roe, 526 U.S. 489 (1999)* ..............................25
19. *San Antonio Ind. Sch. Dist. V. Rodriguez, 411 U,S. 1 (1973)* ..............................31
20. *Students for Fair Admissions v. Harvard College, 600 U.S. 181 (2023)* ..............31
21. *Texas Democratic Party vg. Abbott,* 978 F.3d 168 (5th Cir. 2020), cert. denied, 141 S.Ct. 1124 (2021) ..............................23 & 26
22. *Tully v. Okeson, 977 F.3d 608 (7th Cir. 2020),* cert. denied, 141 S.Ct. 2798 (2021).....25
23. *Tully v. Okeson*, 78 F.4th 377 (7th Cir. 2023) ..............................26, 28 & 29
24. *United States v Carolene Products*, 144 (1938) ..............................31
25. *United States v. Idaho*, 400 U.S. 112 (1970) ..............................8 & 21
26. *United States v. James Daniel Good Real Prop.*, 510 U.S. 43 (1993) ............16
27. *United States v. Reese*, 92 U.S. 214 (1876) ..............................13
28. *United States v. Texas*, 445 F.Supp. 1245 (S.D.Tex. 1978), *aff'd sub nom.* .............16
29. *Symm. v. United States*, 439 U.S. 1105 (1979) ..............................16
30. *Walgren v. Board of Selectmen of Amherst*, 519 E2d 1364 (1st Cir. 1975) .............16


## UNITED STATES CONSTITUTION


Amendment XIV passim
Amendment XV passim
Amendment XIX passim
Amendment XXIV passim
Amendment XXVI passim

## FEDERAL STATUTES

Civil Rights Act of 1960 ....................20
Civil Rights Act of 1964 ....................20
Voting Rights Act of 1965 ....................4 & 20
Voting Rights Act Amendments of 1970 ....................20 & 21

## STATE STATUTES

Idaho Code 34-413 ....................21
S.C. Code 7-13-10 ....................5
S.C. Code 7-13-25 ....................5
S.C. Code 7-15-320 *passim*

## LEGISLATIVE MATERIAL

H.Rep.No. 92-37 ....................2, 3, 12, 19, 20 & 30
S.Rep..No. 92-26 ....................3, 12 & 19
Remarks of Sen. Birch Bayh, 117 Cong. Rec. 5492 (1971) ....................3
Remarks of Rep. Emanuel Celler, 117 Cong. Rec. 7533 (1971) ....................4, 5
Statement of Rep. Claude Pepper, 117 Cong. Rec. 7539 (1971) ....................4
Statement of Rep. Samuel Shellabarger, 42d Cong., Cong. Globe 71 app. (1871) ....................2 & 5
Statement of Sen. Roscoe Conkling, 39th Cong., Cong. Globe 353 (1866) ....................15

## OTHER

Harrison, John, *Reconstructing the Privileges or Immunities Clause,*
101 Yale L.J. 1335 (1992) ....................24
Heritage Foundation, *Standards for Absentee Ballots and All-Mail Elections* ....................33
Keyssar, Alexander, *The Right to Vote* (2000) ....................2
MIT Election Data+Service Lab, *How We Voted in 2020* (2021) ....................4 & 22
Morgan, Thomas, *Election Technology Through the Years* (2023) ....................4
Morley, Michael T., *Racial Equilibration and the Right to Vote* (2015) ....................14
S.C. Election Comm'n., *Voter Participation Summary (1998-2024)* ....................5
Turner, ANCY, *Comment: The Young and the Restless,* 64 Am.U.L.Rev.1503 (2015) ....................3
U.S. Census Bureau, *Voting and Registration in the Election of 1972* (1973) ....................22
Wu, Jennifer, *Are Dead People Voting by Mail?* ....................33

## JURISDICTIONAL STATEMENT

The second amended complaint in this case alleged causes of action under 42 U.S.C. § 1983 for defendants' violations under color of law of plaintiffs' rights secured by the First, Fourteenth, and Twenty-Sixth Amendments to the Constitution of the United States. The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1343(3) and (4).

On March 27, 2025, the district court entered summary judgment for the defendants "thereby concluding this matter." J.A. 116. Appellants filed their Notice of Appeal on April 15, 2025. J.A. 117-118. This Court has extended the time for filing their brief to July 30, 2025. This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1. Whether S.C. Code Ann. § 7-15-320(B)(2) (2022), which gives an unrestricted right to vote by absentee ballot to "persons sixty-five years of age or older," but not to younger persons, violates the Twenty-Sixth Amendment to the U.S. Constitution.
2. Whether S.C. Code Ann. § 7-15-320(B)(2) (2022) violates the Fourteenth Amendment's Equal Protection Clause.

## STATEMENT OF THE CASE

The Twenty-Sixth Amendment to the Constitution forbids any state to "deny or abridge" the "right to vote" for citizens over the age of eighteen "on account of age." South Carolina provides no-excuse absentee voting only to "persons sixty-five years of age or older." S.C. Code Ann. § 7-15-320(B)(2) (2022) J.A. 98.

The district court recognized that the South Carolina law effects "a distinction based solely on age," J.A. 104 but did not consider whether this distinction violates the "deny or abridge" prohibition of the Twenty-Sixth Amendment. Instead, the district court held that absentee voting

is not part of the "right to vote" protected by the Twenty-Sixth Amendment. The district court saw absentee ballots as "merely a privilege, convenience, or accommodation" provided without restriction to older voters. J.A. 109. On this view, limiting unrestricted absentee voting only to older voters does not implicate the "right to vote" protected by the amendment. J.A. 109-110.

The district court denied appellants' Equal Protection claim on similar grounds. J.A. 110-114.

### A. The Twenty-Sixth Amendment

The Twenty-Sixth Amendment was the final stage of an effort to expand the franchise to include younger voters. Title III of the Voting Rights Act Amendments of 1970 had provided that no citizen over the age of eighteen "shall be denied the right to vote . . . on account of age." Pub. L. No. 91-285, § 302, 84 Stat. 314, 318. That same statute also condemned "the lack of opportunities" for "absentee balloting in presidential elections" as constitutionally problematic because it "does not bear a reasonable relationship to any compelling State interest." *Id.* § 202(a).

In Oregon v. Mitchell, 400 U.S. 112 (1970), the Supreme Court upheld Congress's power to extend the right to vote to all citizens over the age of eighteen with respect to federal office. But it held that Congress lacked the power to do so for elections to state and local office. Congress responded by proposing a constitutional amendment, which was swiftly ratified.[1]

The amendment did more than set a new, lower voting age for all U.S. elections. As "part of a constitutional tradition of enlarging participation in our political processes," H. Rep. No. 92-

---

[1] The immediate impetus for the amendment was the proposition that men and women who were "old enough to fight" in the Vietnam War were also "old enough to vote." Nancy Turner, Comment, *The Young and the Restless: How the Twenty-Sixth Amendment Could Play a Role in the Current Debate Over Voting Laws*, 64 Am. U. L. Rev. 1503, 1508 (2015). For example, in arguing for the amendment, Senator Birch Bayh emphasized that half the soldiers who had died in combat in Vietnam "were not old enough to vote for the public officials who sent them there." 117 Cong. Rec. 5492 (1971).

37, at 9 (1971), the new amendment "confer[red] a plenary right on citizens 18 years of age or older to participate in the political process free of discrimination on account of age," *id.* at 7.

Extensive legislative history, including Judiciary Committee reports and floor statements in both the Senate and House of Representatives, emphasized the new Amendment's similarity in purpose and scope to the prior enfranchising amendments, especially the Fifteenth and Nineteenth Amendments. Section One of the amendment "embodies the language and formulation of the 19th amendment, which enfranchised women, and that of the 15th amendment, which forbade racial discrimination at the polls." S. Rep. No. 92-26, at 2 (1971). The House Report was equally emphatic: "It is contemplated that the proposed new article will be construed as comparable in scope to the Fifteenth Amendment and the Nineteenth Amendment which proscribed racial discrimination and sex discrimination, respectively, in the exercise of the franchise." H. Rep. No. 92-37, at 7 (1971). Thus, the amendment was designed to accomplish "exactly" what had been done "in enfranchising the black slaves with the 15th amendment" and "enfranchising women in the country with the 19th amendment." 117 Cong. Rec. 7539 (1971) (statement of Rep. Claude Pepper).

In explaining the scope of the right to vote vindicated by the amendment, the House Report declared that "[t]he section contemplates that the term 'vote' includes all action necessary to make a vote effective in any primary, special or general election," including "casting a ballot." H. Rep. No. 92-37, at 8. This definition was drawn directly from Section 14(c)(1) of the Voting Rights Act of 1965 (now codified at 52 U.S.C. § 10310(c)(1)). Representative Emanuel Celler, the chairman of the House Judiciary Committee, used this same definition of the term "vote" during the floor discussion. 117 Cong. Rec. 7533 (1971). In addition to these statements and calling the right

"plenary," *supra*, Congress also said the term "right to vote" "encompasses the entire political selection process." H. Rep. No. 92-37, at 7.

### B. Absentee Voting in the United States

Over the course of this nation's history, citizens have used a variety of methods to cast their votes. *See generally* Alexander Keyssar, The Right To Vote: The Contested History of Democracy in the United States (2000). Absentee voting has been part of American life for more than 150 years—at least since the Civil War, when nineteen of the Union states provided for absentee voting by soldiers in the field. *Id.* at 104. That is longer than we have had the secret ballot or voting machines, or most other familiar features of today's elections. *See, e.g.*, *id.* at 143 (first U.S. use of secret ballots in 1888); Morgan Thomas, *Election Technology Through the Years*, Council of State Governments (2023) (first mechanical voting machines were invented in the late 1880s), https://www.csg.org/2023/11/08/election-technology-through-the-years/; Cong. Research Serv., Election Day: Frequently Asked Questions 3 (2024) (Congress first set a uniform election day for members of Congress in 1872).

Absentee voting has become more common over time. By 1940, all but five states "had some general provision for absentee voting." Keyssar, *supra*, at 452 n.9. In 1996, eight percent of voters nationwide cast their ballots by mail; by 2016, 21 percent of voters voted by mail, and in the COVID-inflected election of 2020, 46 percent of voters voted by mail, as opposed to 28 percent of voters who cast their ballot in person on Election Day. MIT Election Data + Science Lab, How We Voted in 2020: A Topical Look at the Survey of the Performance of American Elections 6 (Mar. 2021), https://electionlab.mit.edu/research#reports. In South Carolina, the number of citizens casting absentee ballots has gone from roughly 50,000 in the 1998 general election to over 100,000 even after South Carolina implemented opportunities for early in-person voting in 2022. *See* S.C.

Election Comm'n, Voter Participation Summary (1998-2024), https://scvotes.gov/elections-statistics/voter-participation.

### C. The South Carolina statute at issue here J.A. 98.

In South Carolina, ballots may be cast in one of two ways. First, ballots may be cast in person—either on Election Day at assigned precincts or during an early voting period at designated central locations. S.C. Code Ann. § 7-13-10 (2022); *id.* § 7-13-25. Second, votes may be cast absentee, submitted by mail. S.C. Code Ann. § 7-15-320 (2022).

Every registered voter may cast a ballot in person. Not all voters, however, are permitted to vote absentee. South Carolina limits absentee voting to citizens who fall within one of eight statutorily enumerated categories. S.C. Code Ann. § 7-15-320 (2022) J.A. 98-99. Some of those categories are tailored to individuals who cannot get to the polls—for example, because they are "going to be absent from their county of residence" throughout the election period, *id.* § 7-15-320(A)(4), or because they are admitted to a hospital as an emergency patient on election day or shortly before, *id.* § 7-15-320(B)(4). But some voters are entitled to vote absentee even if they are in fact "able to vote during early voting hours" or "during the hours the polls are open on election day," *id.* § 7-15-320(B). In particular, Section 7-15-320(B)(2) gives "persons sixty-five years of age or older" a categorical right to vote absentee. No similar entitlement exists for voters under the age of sixty-five. They may vote absentee only if they fall into one of the seven other enumerated categories.

### D. Proceedings below

Appellants are five registered voters in South Carolina under the age of sixty-five. They alleged that, by denying them the unrestricted right to vote absentee which it gives to voters over age 65, Section 7-15-320(B)(2) violates the Twenty-Sixth Amendment and the Equal Protection

Clause of the Fourteenth Amendment. They sought declaratory and injunctive relief eliminating the discrimination in the state statute.[2]

Appellees (collectively, "the State") are the state and county officials who administer South Carolina's election laws. They opposed appellants' constitutional claims and also raised jurisdictional defenses of lack of standing and "political question."

Appellants filed a motion for judgment on the pleadings under Fed. R. Civ. P. 12. J.A.43-44. This motion was automatically converted to a motion for summary judgment J.A. 79-80 when the State filed factual material (appellants' interrogatory answers) in support of its summary judgment motion. J.A. 45-78. After hearing oral argument, the district court denied appellants' motion and granted the State's motion. J.A. 95-115,116.

In the district court, appellants argued that their Twenty-Sixth Amendment claim should be decided in light of the Fifteenth, Nineteenth and Twenty-Fourth Amendments, which each used the same "deny or abridge" language to enfranchise other classes of voters. J.A. 100, 104. The district court did not address these earlier constitutional amendments except to quote an observation of this Court saying that it was "far from clear that the Twenty-Sixth Amendment should be read to create a cause of action that imports principles from Fifteenth Amendment jurisprudence." *Lee v. Virgina State Bd. of Elections*, 843 F3d 592, 607 (4th Cir. 2016), quoted by the district court at J.A. 104. See also J.A. 100 at n 8.

Instead of addressing the "deny or abridge" language of the Twenty-Sixth Amendment, the district court focused on the "right to vote" language and held that Section 7-15-320(B)(2) neither denies nor abridges the "right to vote" on account of age because—in light of *McDonald v. Board*

---

[2] Appellants also alleged that Section 7-15-320(B)(2) violates the First Amendment, but that claim is not repeated on appeal.

*of Election Commissioners*, 394 U.S. 802 (1969)—"it is not the right to vote that is actually at issue here." J.A. 109. See also J.A. 106. Instead, the court concluded, South Carolina's age-based restriction affected nothing more than the appellants' "wish to vote by absentee ballot for convenience." J.A. 109. Because the law does not "absolutely prohibit or in any way deny . . . the exercise of the franchise"—and because the Constitution permits states to prescribe the "manner" of elections—there is no constitutional violation. J.A. 109-110.

On appellants' claim under the Fourteenth Amendment's Equal Protection Clause, the district court determined that "rational basis" review applies rather than "strict scrutiny," again because South Carolina's law "does not affect [appellants'] fundamental 'right to vote.'" J.A. 112-113. Because the district court found a connection between South Carolina's interest in "preventing voter fraud and ensuring legitimate, orderly elections," and restricting who can vote by mail, it held that the law satisfies rational basis review, and would also satisfy the so-called *Anderson-Burdick* balancing test if that test were applicable. J.A. 113-114.

## SUMMARY OF ARGUMENT

This should be a straightforward case. S.C. Code Ann. § 7-15-320(B)(2) (2022) gives an unrestricted right to vote by absentee ballot to voters over age 65 but not to younger voters. Thus, the district court acknowledged that the statute draws "a distinction based solely on age." J.A. 104.

On its face, Section 7-15-320(B)(2) seems like an obvious violation of the Twenty-Sixth Amendment, which forbids a state to "abridge" the "right to vote" on "account of age." Those two key terms in the Amendment have obvious meanings in ordinary speech. The "right to vote" encompasses the entitlement to cast a ballot in an election. To "abridge" that right is to limit it. Section 7-15-320(B)(2) fits those meanings to a "T."

Yet the district court here and two courts of appeals have reached contrary conclusions. To show why these courts were mistaken, this Brief applies the traditional tools of legal analysis—beginning with the text, and reviewing history and precedent—to show that the way "abridge" and "right to vote" are understood in common parlance is exactly what they mean in the Twenty-Sixth Amendment. Consequently, Section 7-15-320(B)(2)'s "distinction based solely age" is unconstitutional.

The argument on the Twenty-Sixth Amendment claim is divided into three parts:

Part A shows that the Amendment's ban on "abridgment" forbids different treatment. This "no discrimination" definition is supported by (1) the Twenty-Sixth Amendment's use of the same words as the other great enfranchising amendments—the Fifteenth (race) and the Nineteenth (sex)—as well as the Twenty Fourth Amendment (poll tax); (2) the Senate and House of Representatives Committee Reports and floor statements accompanying the Twenty-Sixth Amendment, which repeatedly emphasized that the earlier amendments' language was specifically copied to ensure that the new constitutional amendment, like the earlier amendments, would ban discrimination, (3) Supreme Court decisions construing those earlier amendments which, since the 1870s, have enforced the "no discrimination" rule, and (4) federal and state cases decided soon after ratification of the Twenty-Sixth Amendment which enforced the same "no discrimination" standard under the new Amendment.

Part B of the Brief shows that the "right to vote" in the Twenty-Sixth Amendment is comprehensive, covering all aspects of the voting process, including absentee voting. This conclusion is based on (1) repeated statements in the Twenty-Sixth Amendment's drafting history (including a reference to absentee voting) confirming the vast breadth of the term "right to vote," (2) the broad definition of "vote" and "right to vote" used repeatedly in federal statutes of the

period, again including specific protection of absentee voting, (3) the Supreme Court's contemporaneous decision specifically protecting the right to vote by absentee ballot, *Oregon v. Mitchell* (1970), and (4) the role of absentee voting in state and federal elections, both before and since ratification of the Twenty-Sixth Amendment.

Part C analyzes out-of-circuit decisions that have rejected a Twenty-Sixth Amendment challenges to age discrimination in absentee balloting. It shows why each of those decisions is erroneous, why the district court's reliance on those decisions and on *McDonald v. Board of Election Commissioners*, 394 U.S. 802 (1969) was misplaced, and why the district court's ultimate rejection of appellants' Twenty-Sixth Amendment claim was reversible error.

Turning to the Equal Protection Clause of the Fourteenth Amendment, the argument first shows that the appropriate standard of review here is strict scrutiny. Such scrutiny is required either when a law discriminates against a suspect class or when a law infringes on a fundamental right. Age-based discrimination in voting does both.

Whether a class is "suspect" or a right is "fundamental" depends on whether the class or right is in the Constitution. Protection against age discrimination in voting became an express component of the Constitution in 1971, when the Twenty-Sixth Amendment was ratified. Thus, a state law like the one challenged in this case is now subject to strict scrutiny.

Section 7-15-320(B)(2) cannot survive strict scrutiny. Even assuming that the State's interest in "preventing fraud" is compelling, the State cannot conceivably meet the other part of the stringent test: showing that a law limiting absentee ballots for one age group but not another is narrowly tailored, or even rationally related, to preventing fraud.

Thus Section 7-15-320(B)(2) fails strict scrutiny and thereby violates the Equal Protection Clause of the Fourteenth Amendment.

## ARGUMENT

### I. SECTION 7-15-320(B)(2) VIOLATES THE TWENTY-SIXTH AMENDMENT.

The command of the Twenty-Sixth Amendment is simple: The right to vote of any citizen over the age of eighteen "shall not be denied or abridged by the United States or by any State on account of age." U.S. Const. amend. XXVI, § 1.

The straightforward reading of this text forbids states from treating voters differently, in any way, and in any aspect of the voting process, based on their age.

Under our Constitution, the Fifteenth Amendment would clearly prohibit South Carolina from making absentee voting easier for voters of one race than another; the Nineteenth Amendment would prohibit the state from making absentee voting easier for women than for men; and the Twenty-Fourth Amendment would prohibit the state from making absentee voting more readily available to voters willing to pay a poll tax.

So too, the Twenty-Sixth Amendment forbids South Carolina from maintaining an absentee voting regime that allows older voters—but not younger ones—to cast a ballot at virtually any time during election season, from virtually any place, without any excuse. The text of the Twenty-Sixth Amendment, its drafting history, and the Supreme Court's vigorous enforcement of the earlier, similarly-worded enfranchising amendments prove that Section 7-15-320(B)(2) violates the Twenty-Sixth Amendment.

### A. The words "deny or abridge" in the Twenty-Sixth Amendment prohibit any different treatment of voters on the account of age.

1. Text of the Twenty-Sixth Amendment.

The words of the Twenty-Sixth Amendment are not just simple—they are also familiar. When Congress borrows a familiar word or phrase like "abridged" or "the right to vote," it "presumably knows and adopts the cluster of ideas that were attached to [it]" in other legal texts. *Morissette v. United States*, 342 U.S. 246, 263 (1952). Even more so here: "When seeking to discern the meaning of a word in the Constitution, there is no better dictionary than the rest of the Constitution itself." *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 829 (2015) (Roberts, C.J., dissenting).

The operative language of the Twenty-Sixth Amendment is identical to that of three predecessor amendments,[3] save for the category of citizens protected. Thus, those other voting rights amendments, and controlling Supreme Court precedent construing that language, provide the best guide to the definition of "abridged" and the "right to vote."

No court has ever denied that the Twenty-Sixth Amendment was cast in the mold of the earlier enfranchising amendments. Nor could it. This Court's observation that "it is far from clear that the Twenty-Sixth Amendment should be read to create a cause of action that imports principles from Fifteenth Amendment jurisprudence," *Lee v. Virginia State Bd of Elections*, 843 F3d 592, 607 (4th Cir. 2016), must be read in context. That statement was not a holding and not really a dictum. It came in a case where the record would not have supported a Twenty-Sixth Amendment claim in

[3] In addition to the three predecessor amendments – the Fifteenth (race), Nineteenth (sex), and Twenty-Fourth (poll tax payment) — Section 2 of the Fourteenth Amendment provides that a state's congressional representation be reduced if the right to vote is "denied to any of the male inhabitants of such State, being twenty-one years of age, and citizens of the United States, or in any way abridged except for participation in rebellion, or other crime."

any event and is best understood as this Court's leaving the question open until it was properly presented.

This case presents the question squarely. Text and history show that the Twenty-Sixth Amendment copied the prior enfranchising amendments—the Fifteenth, Nineteenth and Twenty-Fourth — and incorporates precisely their principles of "no discrimination" in any aspect of casting a ballot and vigorous enforcement against any difference in treatment.

2. Drafting history of "deny or abridge" in the Twenty-Sixth Amendment.

The history of the Twenty-Sixth Amendment confirms that it must be read *in pari materia* with those earlier Amendments. Congress drafted the Twenty-Sixth Amendment to "embod[y] the language and formulation" of the existing voting rights amendments. S. Rep. No. 92-26, at 2 (1971). Thus, Congress "contemplated" that the Twenty-Sixth Amendment would "be construed as comparable in scope to the Fifteenth Amendment and the Nineteenth Amendment which proscribed racial discrimination and sex discrimination, respectively, in the exercise of the franchise." H. Rep. No. 92-37, at 7 (1971). In short, the Amendment was designed to accomplish "exactly" what had been done "in enfranchising the black slaves with the 15th amendment" and "enfranchising women in the country with the 19th amendment." 117 Cong. Rec. 7539 (1971) (statement of Rep. Claude Pepper). It therefore follows that if a provision would violate the Fifteenth Amendment if it were applied to citizens "on account of [their] race, color, or previous condition of servitude," or the Nineteenth Amendment, if applied to citizens "on account of [their] sex," or the Twenty-Fourth Amendment, if applied to citizens for their "failure to pay any poll tax or other tax," it violates the Twenty-Sixth Amendment if it is applied to adult citizens "on account of [their] age."

3. Enforcement history of the prior enfranchising amendments.

In case after case, the Supreme Court (and lower federal courts) have interpreted the earlier enfranchising amendments to reject any different treatment, however denominated, against voters protected by the amendment. The district court here did not accept appellants' argument that the words "deny or abridge" mean "no discrimination," J.A. 100, 104, but "no discrimination" has been the clearly understood meaning of "deny or abridge" since the Supreme Court's first interpretation of those words 150 years ago in the Fifteenth Amendment: "Previous to this amendment, there was no constitutional guaranty against this discrimination: now there is." *United States v. Reese*, 92 U.S. 214, 218 (1876).

In *Lane v. Wilson*, 307 U.S. 268 (1939), the Court explained that the Fifteenth Amendment forbids any "onerous procedural requirements which effectively handicap exercise of the franchise" even if "the abstract right to vote may remain unrestricted as to race." *Id.* At 275. Under that amendment, the only question is whether citizens of different races are treated equally with respect to the opportunity to vote. Any law that makes voting easier for white voters, but not minority voters, would plainly violate the Fifteenth Amendment, even if it left minority voters in exactly the same position they occupied before enactment of the new white-preferring law. Justice Scalia made precisely this point in his opinion for the Court in *Reno v. Bossier Parish School Board*, 528 U.S. 320 (2000), when he explained that the term "abridge" in the Fifteenth Amendment does *not* ask whether a "*change* 'abridges the right to vote,'" but rather whether there has been "discrimination more generally." *Id.* at 334 (emphasis added).

Nor does the form of the discrimination matter. Whereas some cases involve exclusion of minority voters, giving a benefit only to white voters also falls afoul of the "deny or abridge" language. In *Guinn v. United States*, 238 U.S. 347 (1915), the Court struck down, as violative of

the Fifteenth Amendment, an Oklahoma constitutional provision that nominally required all voters to pass a literacy test but then exempted men whose ancestors had been eligible to vote before 1866. The question in *Guinn* was not whether the literacy test itself (which was perfectly legal at the time) discriminated against Black aspiring voters, but rather whether the "grandfather clause" gave white voters a benefit that Black voters were denied. It did, and so the Court found a Fifteenth Amendment violation. *Id.* at 364-65.

More recently, the Supreme Court's construction of the Twenty-Fourth Amendment in *Harman v. Forssenius*, 380 U.S. 528 (1965), confirms that when a state treats two classes of voters differently, it has "abridged" the less favored class's right to vote. In anticipation of the ratification of the Twenty-Fourth Amendment, which would have barred the Commonwealth from conditioning the right to vote in federal elections on payment of a poll tax, Virginia enacted a provision that required voters in federal elections either to pay the preexisting poll tax or to file a certificate of residence each year. *Harman*, 380 U.S. at 531-32. The Supreme Court held unanimously that this filing requirement was "repugnant to the Twenty-fourth Amendment" because it imposed a burden, no matter how slight, only on those who had claimed their right to vote free of the poll tax. *Id.* at 542. Even if the new requirement was "no more onerous, and even somewhat less onerous, than the poll tax" itself, imposing the requirement only on non-taxpayers was unconstitutional. *Id.* at 542. So even if requiring some South Carolina citizens to appear at the polls to vote is not particularly burdensome, denying them the right to vote from home enjoyed by other voters "abridges" their right.

The construction of Section 2 of the Fourteenth Amendment reinforces this point. Section 2 threatened states with loss of congressional representation if they denied "or in any way abridged" adult male citizens' right to vote except for participation in rebellion or criminal

conviction. During congressional debate over the amendment, both supporters and opponents of the amendment "agreed that the term 'abridge,' as used in the proposal, referred to the imposition of qualifications to vote for blacks, such as property or intelligence requirements, that did not also apply to white people." Michael T. Morley, *Remedial Equilibration and the Right to Vote under Section 2 of the Fourteenth Amendment*, 2015 U. Chi L.F. 279, 310. A state would avoid abridgment only if it "should impose qualifications alike upon white and black." *Id.* at 311 (quoting Cong. Globe, 39th Cong., 1st Sess. 353 (1866) (statement of Rep. Roscoe Conkling)). It would, of course, have been an abridgment of the right to vote for purposes of Section 2 if a state required Black voters, but not white voters, to own their homes or to satisfy an intelligence requirement in order to vote absentee. Therefore, it is just as clearly an abridgment to require voters under sixty-five, but not voters over sixty-five, to provide a statutory excuse to receive an absentee ballot.

One notable enforcement action even involved absentee ballots. In *Brown v. Post*, 279 F. Supp. 60 (W.D. La. 1968), the court found a Fifteenth Amendment violation where a municipality took affirmative steps to help residents in a white nursing home vote absentee while it made no similar efforts for residents in a Black nursing home. *Id.* at 61-64. Even though Black voters "were not refused" the right to vote absentee, defendants' unequal treatment of Black and white voters still violated the Fifteenth Amendment. *Id.* at 62-64. Given *Brown*, it would *a fortiori* violate the Fifteenth Amendment if a municipal ordinance gave white voters, but not Black voters, the right to vote absentee. By the same token, it would violate the Nineteenth Amendment if men but not woman were allowed to vote absentee. Substituting "voters over sixty-five" for "white" or "men" and substituting "voters under sixty-five" for "Black" or "women" in the hypothetical law does not change the law's unconstitutionality. Section 7-15-320(B)(2) is the real-world counterpart of that unconstitutional statute. It thus violates the Twenty-Sixth Amendment.

Section 7-15-320(B) is not a "sophisticated" infringement on voting rights; it is discrimination in its most "simple-minded" form. *Lane*, 307 U.S. at 275. The Twenty-Sixth Amendment, no less than its predecessors, forbids this kind of discrimination.[4]

4. <u>Court decisions soon after the Twenty-Sixth Amendment was ratified.</u>

Shortly after ratification of the Twenty-Sixth Amendment, the First Circuit declared that "it is difficult to believe" that that amendment "contributes no added protection to that already offered by the Fourteenth Amendment." *Walgren v. Bd. of Selectmen of Amherst*, 519 F.2d 1364, 1367 (1st Cir. 1975). As the Supreme Court has repeatedly emphasized, the general protections of the Fourteenth Amendment do not preempt the specific protections of the voting rights amendments. Each of these amendments has "independent meaning and force." *Rice v. Cayetano*, 528 U.S. 495, 522 (2000); *see also United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 49 (1993) ("We have rejected the view that the applicability of one constitutional amendment preempts the guarantees of another."). Thus, the Twenty-Sixth Amendment adds further protection against age-based discrimination to what the Fourteenth Amendment might (or might not) supply on its own.

About that same time, a district court in Texas struck down a subsection of the Texas Election Code that determined the "voting residency of persons under twenty-one years of age on a different basis than persons twenty-one years of age and older," holding that the provision "abridges the right to vote of persons who are eighteen but not yet twenty-one years of age in violation of the Twenty-Sixth Amendment to the United States Constitution." *Ownby v. Dies*, 337 F. Supp. 38, 39 (E.D. Tex. 1971). Even after that decision, one county voting registrar would not

---

[4] In the district court proceedings, some questions were raised about the correct "level of scrutiny." That issue applies to claims under the Equal Protection Clause of the Fourteenth Amendment and is discussed in that section of this brief. It is not relevant to claims under the Twenty-Sixth Amendment, which outright forbids denial or abridgment, without regard to any balancing test.

register college students unless they swore to their intent to remain in that voting district after graduation—an oath required of no other class of voters. A three-judge district court quickly enjoined the registrar's practice as inconsistent with "the guarantees" of the Twenty-Sixth Amendment. *United States v. Texas*, 445 F. Supp. 1245, 1256 (S.D. Tex. 1978). The Supreme Court summarily affirmed. *Symm v. United States*, 439 U.S. 1105 (1979). Justice Rehnquist and Chief Justice Burger dissented on grounds that the three-judge district court lacked jurisdiction, but did not dispute that "the District Court may have been justified in concluding that the appellant registrar violated rights guaranteed to Prairie View students under the Twenty-sixth Amendment to the United States Constitution." *Id.* at 1107.

In *Jolicoeur v. Mihaly*, 488 P.2d 1 (Cal. 1971), the Supreme Court of California held that the Twenty-Sixth Amendment requires states "to treat all citizens 18 years of age or older alike for *all purposes* related to voting." *Id.* at 12 (emphasis added). The California Attorney General had issued an opinion concluding that "for voting purposes the residence of an unmarried minor" (i.e., a person under the age of 21) "will normally be his parents' home regardless of where the minor's present or intended future habitation might be." *Id.* at 3. Local registrars accordingly told the individual *Jolicoeur* plaintiffs to register where their parents lived. *Id.* Some plaintiffs would have been forced to register far away from their claimed permanent residences, while others, whose parents lived in other states or abroad, would not have been able to register in California at all. *Id.* The California Supreme Court held this age-based restriction unconstitutional: "[T]o treat minor citizens differently from adults *for any purpose related to voting* would violate the Twenty-Sixth Amendment." *Id.* at 2 (emphasis added).

The court stressed that the new Twenty-Sixth Amendment was "like the Twenty-Fourth, Nineteenth, and Fifteenth before it." *Id.* at 4. Pointing to the "similar language" of those

Amendments, it grounded its interpretation in Fifteenth and Twenty-Fourth Amendment precedent. *Id.* The Twenty-Sixth Amendment likewise forbade any restrictions that "handicap[ped] exercise of the franchise," even if "the abstract right to vote" remained "unrestricted." *Id.* (quoting *Lane*, 307 U.S. at 275). And the court recognized that, under this interpretation, *any* differential treatment of older and younger voters would violate the Twenty-Sixth Amendment. *Id.* at 2, 12. The "fundamental importance of the franchise," reasoned the court, requires applying "uniform standards and procedures to all qualified voters equally." *Id.* at 11.

The next year in *Colorado Project-Common Cause v. Anderson*, 495 P.2d 220 (Colo. 1972), the Supreme Court of Colorado invalidated a state law that barred eighteen to twenty-year-old citizens from circulating and signing initiative petitions.

Citing *Jolicoeur*, the court emphasized that one purpose of the Twenty-Sixth Amendment was to ensure "full participation of young voters in the political process." *Id.* at 223. It was not enough to permit them to vote on initiatives that had already qualified for the ballot. *Id.* Rather, the Twenty-Sixth Amendment applied "to the entire process involving the exercise of the ballot and its concomitants." *Id.* At no point in the electoral process—from registration to casting a ballot—could Colorado treat voters differently on account of their ages.

In short, newer cases, as well as older ones, confirm that "no abridgment" means "no discrimination."

**B. The "right to vote" includes absentee voting.**

That absentee voting was fully comprehended within the Twenty-Sixth Amendment's protection of the "right . . . to vote" is confirmed by the 1971 ratification debates (including a specific reference to absentee voting), contemporaneous legislation that specifically protected absentee voting, the Supreme Court's decision in one of the component cases in *Oregon v.*

*Mitchell*, 400 U.S. 112 (1970), and the increasingly important role that absentee voting has played in our democracy for a century and a half.

1. <u>The drafting history of the words "right . . . to vote" in the Twenty-Sixth Amendment</u>.

As appellants have already explained, the framers of the Twenty-Sixth Amendment emphasized that the Amendment protected the right to vote in its broadest sense. *See supra* at 2-3. The drafting history of the Amendment shows this. The 1970 statute extending the right to vote to eighteen year-olds provided that the newly enfranchised voters could not be "denied the right to vote in any such primary or election." The Twenty-Sixth Amendment not only added the prohibition on "abridgment," but also broadened the protection to the entire right to vote. The House Report explained that the proposed Amendment would cover "the entire political selection process:"

> "Unlike Title III of the Voting Rights Act Amendments of 1970, which is formulated in terms of primary or general elections, the proposed new article of amendment is addressed to the right to vote. The language of the proposed new article, paralleling that of other articles of amendment that enlarged the franchise, encompasses the entire political selection process."

H. Rep. No. 92-37, at 7. The House Report emphasized that the right protected by the Twenty-Sixth Amendment is a right to participate in "the political process," and that right is "plenary." *Id.*

Indeed, the Senate Report expressly recognized that rules about absentee voting could implicate the "right to vote" protected by the Amendment. In describing types of problems the new Amendment was designed to address, the Senate Report observed that without the amendment, some states might *require* younger voters (voting in federal elections) to vote "by absentee ballot" while older voters could cast their ballots in "the usual polling places. S.

Rep. No. 92-26, at 14. Thus, the amendment was designed to ensure that younger voters would have the same access to voting methods that their older counterparts enjoyed.

2. <u>The public meaning of the "right to vote" in 1971, based on federal law, explicitly included absentee voting</u>.

The district court thought that "the right to vote in 1971 did not include a right to vote by mail." J.A. 107 (quoting *Tex. Democratic Party*, 978 F.3d at 188). Not so. The Fifth Circuit itself acknowledged that "almost all states" gave at least some voters that right. *Id.* And it also acknowledged that in the 1970 Act, Congress, using its voting rights-related powers, had "give[n] all voters who were going to be absent on election day *a right to vote absentee* for a presidential ticket." *Id.* at 187-88 (emphasis added).

Quite contrary to the Fifth Circuit |(and the district court here), the public meaning of the "right to vote" at the time the Twenty-Sixth Amendment was ratified appears in repeated federal laws that defined the term "vote" in the broadest way. The Civil Rights Act of 1960, the Civil Rights Act of 1964, and the Voting Rights Act of 1965 all provided, with tiny variations, that "the terms 'vote' or 'voting' shall include all action necessary to make a vote effective" including "casting a ballot."[5] And Congress declared that the Twenty-Sixth Amendment specifically "contemplate[d]" that definition. H. Rep. No. 92-37, at 8.

Absentee voting clearly falls within this definition. For example, in the same 1970 statute that extended the franchise to eighteen year-olds another provision—that the Supreme Court

[5] Section 601 of the Civil Rights Act of 1960, 74 Stat. 86, now codified at 52 U.S.C. § 10101(e); Section 101(a) of the Civil Rights Act of 1964, 78 Stat. 241, now codified at 52 U.S.C. § 10101(a)(3)(A); Section 14(c)(1) of the Voting Rights Act of 1965, 79 Stat. 437, now codified at 52 U.S.C. § 10110(c)(1).

upheld—created uniform national rules for absentee voting in presidential elections. Congress declared, in adopting these protections, that "the lack of sufficient opportunities for absentee registration and absentee balloting . . . denies or abridges the inherent constitutional right of citizens to vote." Pub. L. No. 91-285, § 202(a), 84 Stat. 314, 316 (1970). These congressional findings were repeated six times in successive subsections of Section 202(a) of the 1970 Act.

Based on this and related findings, Section 202(d) of the 1970 Act also provided that "each State shall provide by law for the casting of absentee ballots for the choice of electors for President and Vice President . . ."

Thus, when Congress proposed the Twenty-Sixth Amendment less than a year later, it incorporated that understanding of absentee voting as integral to the right to vote.

3. The Supreme Court's decision in *Oregon v. Mitchell* confirms that absentee voting is an integral part of the "right to vote."

The Supreme Court's decision in *Oregon v. Mitchell*, 400 U.S. 112 (1970), further confirms that by the time the Twenty-Sixth Amendment was proposed and ratified, the opportunity to cast an absentee ballot was part of the right to vote. That case is best known for its split decision on Congress's attempt to extend voting rights to eighteen year-olds (valid for federal elections but not state or local elections). The decision, however, also addressed other provisions of the Voting Rights Act Amendments of 1970, one of which was the absentee voting provision described above, involving Section 202(d) of the 1970 Act.

One of the four consolidated cases that were decided under the umbrella title of *Oregon v. Mitchell* was *United States v. Idaho*. That case involved a federal challenge to Idaho's absentee ballot law, which required newly arrived residents to "mark" their ballot, albeit secretly, "in the presence of the county auditor," *Mitchell*, 400 U.S. at 226-27 (reprinting Idaho Code § 34-413),

thereby precluding them from voting absentee. The Voting Rights Act Amendments, by contrast, required Idaho to "permit absentee registration and voting by persons who have lived in Idaho for less than six months." *Id.* at 155 (Harlan, J., concurring in part and dissenting in part) (explaining the federal requirement).

Although the Justices were divided over many of the provisions of the Act, the Court rejected Idaho's challenge to the absentee ballot provision by an 8-1 vote. *See Oregon v. Mitchell*, 400 U.S. at 119 (opinion of Black, J., explaining the vote count). As Justice Black explained in the opinion announcing the judgment of the Court, Congress enacted "national rules for absentee voting in presidential and vice-presidential elections" to "insure a fully effective voice to all citizens." *Id.*

4. <u>The scope of the "right to vote" must reflect the way citizens actually cast their ballots</u>.

From *viva voce* voting, to party-supplied ballots, to the Australian ballot, to punch cards, optical scan, and audit trail machines, the way citizens indicate their choices for public office and ballot propositions has changed. The idea that the scope of the right to vote is restricted to only the ways people voted in 1971 (or 1789 or 1870) cannot be sustained.

Moreover, absentee voting has become only more integral to American elections. In 2022, almost one third of voters nationwide voted by mail. MIT Election Data + Sci. Lab, *Voting by Mail and Absentee Voting*, https://perma.cc/43UN-LDL6 (Feb. 28, 2024). That is compared with only four percent of voters in 1972. U.S. Census Bureau, P20-253, Voting and Registration in the Election of November 1972, at 7 (1973), https://perma.cc/E56M-FCD2. More than ever before, absentee voting is a widespread and growing method of casting a ballot. So when a state restricts the ability of some voters to use this method, that restriction abridges the right to vote.

### C. **<u>The district court erred by misinterpreting a Supreme Court decision and by following erroneous decisions from two other circuits.</u>**

Two federal courts of appeals have recently upheld age-based restrictions on no-excuse absentee voting against Twenty-Sixth Amendment challenges. Those decisions were erroneous because they were based on various misinterpretations of the critical terms "abridge" and "right to vote," and on a misreading of the Supreme Court's decision in *McDonald v. Board of Election Commissioners*, 394 U.S. 802 (1969).

The district court here followed these flawed court of appeals decisions and thereby committed reversible error.

#### 1. The Fifth Circuit erroneously adopted an untenable definition of "abridge" that requires retrogression.

In *Texas Dem. Party v. Abbott*, 978 F3d 168 (5th Cir. 2020)[6], the Fifth Circuit upheld Texas's restriction of no-excuse absentee voting to voters over the age of sixty-five. It rested that holding expressly on the proposition that "an election law abridges a person's right to vote for purposes of the Twenty-Sixth Amendment only if it makes it more difficult for that person to vote than it was before the law was enacted or enforced." *Texas Dem. Pty,* 978 F3d at 190-91.

This definition is simply untenable. According to the Fifth Circuit, the ban on abridgment in the Twenty-Sixth Amendment (and presumably the other right-to-vote amendments) bans only "retrogression"—that is, deprivation of voting rights a voter already had. Neither the Fifth Circuit nor the district court here cited any case in support of this bizarre rule, and appellants do not believe that any previous court has ever so held.

[6] *Cert. denied, 141 S.Ct. 1124 (2021).*

To the contrary: The Supreme Court has explicitly rejected a "retrogression" reading of the Fifteenth Amendment (in contrast to Section 5 of the Voting Rights Act, which at the time banned only retrogression). *See Reno v. Bossier Parish School Board*, 528 U.S. 320, 334 (2000) (the Fifteenth Amendment asks whether there has been "discrimination more generally" and not whether it is the "change" that "abridges the right to vote").

It is easy to see why a retrogression rule is indefensible. The Twenty-Sixth Amendment, like the Fifteenth and Nineteenth Amendments before it, enfranchised people who previously had had no right to vote at all. If "abridged" meant only retrogression, then any non-absolute barrier—no matter how high—could never be an abridgment because as long as there was no longer a complete denial of the right to vote, the protected group would not be worse off under the challenged practice. So under a retrogression rule, if a state upon adoption of the Twenty-Sixth Amendment had provided that voters under the age of 21 could vote, but only between the hours of noon and 1 p.m., while all other voters could vote any time between 7 a.m. and 7 p.m., the younger voters' rights would not be "abridged" under the Fifth Circuit's standard because they were not worse off than before. That cannot be right.

Put another way, "abridge," in the Twenty-Sixth Amendment, as in the Fifteenth and Nineteenth Amendments, does not depend on a comparison between the extent of a voter's past and present opportunities to vote. Rather, it compares that voter's opportunity and the opportunity enjoyed by other voters.

Other uses of the word "abridge" in the Constitution bear this out. For example, the First Amendment prohibits the government from "abridging" free speech, press, assembly, and petition. U.S. Const. amend. I. No one would seriously suggest that a prerequisite for a free speech, press or assembly claim is proof of one's former, greater First Amendment freedoms. An individual

whose speech rights have been restricted relative to those enjoyed by other individuals has had his rights "abridge[d]."

Similarly, the Fourteenth Amendment's Privileges or Immunities Clause prohibits any state from making or enforcing a law "which shall abridge the privileges or immunities of citizens of the United States." U.S. Const. amend. XIV, § 1. The purpose of this provision was not (just) to prevent citizens from losing their existing rights. It was to ensure "that one man shall not have more rights upon the face of the laws than another man." Cong. Globe, 42d Cong., 1st Sess. 71 app. (1871) (Rep. Shellabarger), quoted in John Harrison, *Reconstructing the Privileges or Immunities Clause*, 101 Yale L.J. 1385, 1423 (1992).

The Supreme Court's decision in *Saenz v. Roe*, 526 U.S. 489 (1999), shows why abridgment cannot require retrogression. In administering a benefit program, California set payment amounts for new arrivals at the same level they had or would have had in the states they came from. The Supreme Court held this was an abridgement of the "privilege or immunity" of interstate travel because the new arrivals received less than other beneficiaries, even though the amounts were not lower than the new arrivals had previously received in their old states. The abridgment was assessed by looking at the two categories of beneficiaries, not by looking at the before and after circumstances of the plaintiffs.[7]

2. <u>The Seventh Circuit's 2020 decision erred in holding that the absentee voting is not part of the "right to vote" at all.</u>

During the 2020 election season, the Seventh Circuit upheld denial of a preliminary injunction in a case challenging Indiana's restriction of no-excuse absentee voting to citizens over

---

[7] The district court followed the Fifth Circuit further into error by insisting that "South Carolina's absentee voting law does not absolutely prohibit ort in any way deny Plaintiffs the exercise of the franchise," J.A. 109. See quotation of a similar Fifth Circuit statement. J.A. 107. But this view simply reads "abridge" out of the Amendment, in effect making "Abridge" nothing more than a synonym for "deny." The canon against treating language as surplusage refutes that interpretation.

the age of sixty-five. *Tully v. Okeson*, 977 F3d 608 (7th Cir. 2020)[8]. The Seventh Circuit based its rejection of the Twenty-Sixth Amendment challenge on the proposition that, under the Supreme Court's decision in *McDonald v. Board of Election Commissioners,* 394 U.S. 802 (1969), the "right to vote" simply does not include absentee voting at all. But this holding fundamentally misread *McDonald.*

In *McDonald*, petitioners claimed that a state law providing absentee ballots to certain voters but not petitioners (pretrial detainees who were both registered to vote and detained in Cook County, Illinois) was a denial of equal protection in violation of the Fourteenth Amendment. The Supreme Court observed that nothing in the record indicated that petitioners were unable to vote in some other fashion and then said: "It is thus not the right to vote that is at stake here but a claimed right to receive absentee ballots." *McDonald*, 394 U.S. at 807. The Court addressed only whether there had been a "denial" of equal protection. The question whether some right had been "abridged" was never addressed; indeed no form of that word appears anywhere in the opinion. But the Twenty-First Amendment, ratified two years after *McDonald*, added a ban on abridgment. The Seventh Circuit's opinion essentially held that the word "abridge" in the Twenty-First Amendment counted for nothing.[9]

The Seventh Circuit's disparagement of absentee voting was further undermined, even under the Fourteenth Amendment, in *American Party of Texas v. White*, 415 U.S. 767, 794-95 (1974). There, a state law provided that only major party candidates would be listed on the printed

---

[8] *Cert. denied, 141 S.Ct. 2798 (2021).*

[9] Although the point is not relevant in this Twenty-Sixth Amendment case, the Seventh Circuit's reading of *McDonald* (like the reading of the district court here J.A. 109) was dubious even under the Fourteenth Amendment. A straightforward reading of *McDonald* would have understood the Court as simply saying that eliminating one method of voting does not completely deny the right to vote. Instead, the Seventh Circuit misread the case to put absentee voting completely out of the realm of voting. That this was erroneous was confirmed by the Supreme Court's 1974 decision in *American Party of Texas v. White*, discussed in the next paragraph.

absentee ballot. The Supreme Court ordered relief under the Equal Protection Clause even though the wish to vote absentee was purely for convenience: Any voter who preferred another candidate could simply have chosen to vote in person.

Even the Fifth Circuit, while adopting its defective "retrogression" theory, nonetheless rejected the Seventh Circuit's reading of *McDonald*– that absentee voting is not part of the "right to vote." *Texas Dem. Party,* 978 F.3d at 193.

In the end, the Seventh Circuit itself revisited Indiana's discriminatory absentee voting law after the district court there entered a final judgment. *Tully v. Okeson*, 78 F.4th 377 (2023).[10] It abandoned the proposition that absentee ballots are not part of the right to vote. Instead, it observed that the 2020 ruling had come in the exigent circumstances of a preliminary injunction involving pre-election litigation. Accordingly, the Seventh Circuit declined to treat the earlier decision as "law of the case." 78 F4th at 381-382. Instead, it offered an entirely different theory for why age-based discrimination in absentee voting is somehow permissible despite the Twenty-Sixth Amendment.

However, the district court here followed the Seventh Circuit's first (2020), subsequently superseded decision. That decision had already been repudiated by the Seventh Circuit, and this Court should reject it as well.

[10] The district court also followed the Seventh Circuit in apparent over-reliance on the Elections Clause of the Constitution, Art. 1, Sec. 4. J.A. 109, following J.A. 108 n. 14. This clause does give states authority to prescribe the "manner" of conducting federal elections, but that power must of course be exercised subject to constitutional requirements – in this case the Twenty-Sixth Amendment. The Supreme Court reaffirmed that constitutional principle in *Moore v. Harper*, 600 U.S. 1 (2023), especially 600 U.S. at 22, where the Court emphatically rejected the North Carolina legislature's effort to create an exception to this fundamental rule of constitutional supremacy.

3. The Seventh Circuit's 2023 decision erroneously injected a significant burden test into the Twenty-Sixth Amendment.

In 2023, when the Seventh Circuit returned to the Indiana law, this time after a final judgment, it correctly rejected the Fifth Circuit's "retrogression" definition of "abridge." It explained that "whether [the Indiana law] renders the Plaintiffs 'worse off,' is *not* the equivalent of asking whether their right to vote has been abridged." *Tully v. Okeson*, 78 F.4th 377, 387 (7th Cir. 2023) (emphasis in the original).

But the 2023 panel committed a different error by distorting Supreme Court cases.

First, it misread the Supreme Court's decision in *Harman v. Forssenius*, 380 U.S. 528 (1965). *Harman* struck down Virginia's requirement that voters who did not pay the poll tax must file a certificate of residence in order to vote in federal elections. *See supra* at 14 (discussing *Harman*). In the course of holding that the filing requirement violated the Twenty-Fourth Amendment, the Supreme Court stated that "*[a]ny* material requirement imposed upon the federal voter solely because of his refusal to waive the constitutional immunity subverts the effectiveness of the Twenty-fourth Amendment and must fall under its ban." *Id.* at 542 (emphasis added); the Court added this was so even if the requirement was "no more onerous, or even somewhat less onerous," than paying the poll tax. *Id.* at 542. In context, the word "material," as it does so often in legal discussions, meant "relating to the process." The Seventh Circuit, though, mistakenly treated the word "material" as the equivalent of "significant" or "unduly burdensome," saying: "In short, the Court is clear that an "abridgement" must involve the imposition of a 'material requirement.'" *Tully*, 78 F.4th at 386.

The Seventh Circuit's next step under this definition of "abridge" as the imposition of a "material requirement" was simply to hold that giving some citizens more voting opportunities than others is just not an "abridgement:"

> Indiana imposes no requirements, much less *material* requirements, on the exercise of the franchise through this accommodation of the elderly. The extension of absentee voting to the elderly does not impose any unconstitutional burden on the right of those under sixty-five to exercise the franchise. Consequently, there is no abridgement as that term is understood in the Supreme Court's case law."

*Id.* at 387. This sweeping pronouncement goes far beyond the Twenty-Sixth Amendment to do serious damage to the Fifteenth and Nineteenth Amendments as well. After 150 years of Supreme Court doctrine that "abridge" means "no discrimination," the Seventh Circuit seems to be holding that *some* discrimination—including express, intentional discrimination—is constitutional. But that cannot be right. Could a state give men more polling places, or white people fewer hours to vote so long as women have enough polling places or minority citizens have enough hours to vote? Or could a city choose to allow absentee voting only for people *under* age sixty-five? Those questions answer themselves.[11]

4. <u>The district court's decision here compounded the errors of the Fifth and Seventh Circuits.</u>

By the time the district court came to its decision in 2025, its holding that "it is not the right to vote that is actually at issue here," J.A. 109-110. See also J.A. 105-108, was without any case support, as was its reliance on *McDonald* for that proposition. The district court, however, followed the *first* opinion of the Seventh Circuit. The Seventh Circuit's first opinion, on which the district court mainly relied for that view, had rejected it after a second look. *Tully*, 78 F4th 377. The Fifth Circuit had rejected it from the start. *Texas Dem. Party*, 978 F3d at 193. The Supreme Court's

---

[11] Without quite saying so, the Seventh Circuit appears to have put absentee voting in a category it called "peripheral matters typically left to the states." *See Tully*, 78 F4th at 384. The appeals court said such a category was implicitly recognized by the U.S. Supreme Court when it upheld the Voting Rights Act of 1965 in *South Carolina v. Katzenbach*, 383 U.S. 301 (1986). This was a gross distortion of *Katzenbach* and the Voting Rights Act, which stood for just the opposite: a recognition that voting denial and abridgment come in all forms, and therefore the Act covers "any state enactment which altered the election law of a covered State in even a minor way." Allen v. State Bd of Elections, 393 U.S. 544, 566 (1969).

1974 decision, *American Party*, 415 U.S. at 794-95, further undermined it. And there was no case suggesting that the meaning of "abridge" under the Twenty-Sixth Amendment should be controlled by a 1969 case about the meaning of "deny" under the Fourteenth Amendment.

The Fifth Circuit opinion also included some unfortunate dicta that also led the district court here astray. Prime among this was the Fifth Circuit's statement that "[i]n summary, the right to vote in 1971 did not include a right to vote by mail." 978 F3d at 188. *See* J.A. 107. As appellants have already explained, that statement is not true. *See supra* page 19. In fact, Congress had expressly declared that the right to vote *could* be denied or abridged by unfair absentee voting rules. *See supra* at 20.

Text, history, and contemporaneous precedent are clear: The Twenty-Sixth Amendment is a categorical prohibition on age-based discrimination with respect to voting. It admits of no exceptions. As the House Report accompanying the proposed amendment declared, the amendment "confers a plenary right on citizens 18 years of age or older to participate in the political process *free of discrimination* on account of age," H. Rep. No. 92-37, at 7 (1971) (emphasis added).

## II. <u>THE FACIAL AGE-BASED CLASSIFICATION IN SECTION 7-15 320(B)(2) VIOLATES THE FOURTEENTH AMENDMENT'S EQUAL PROTECTION CLAUSE.</u>

Section 7-15-320(B)(2)'s restriction of no-excuse absentee voting to electors over the age of sixty-five violates the Equal Protection Clause of the Fourteenth Amendment. After ratification of the Twenty-Sixth Amendment in 1971, age-based discrimination in voting must satisfy strict scrutiny. South Carolina's restriction cannot survive strict scrutiny because it is not narrowly tailored to serve a compelling interest.

### A. Strict scrutiny applies to a voting law that discriminates on account of age.

The district court erred in not applying strict scrutiny to Section 7-15-320(B)(2). This is because whatever the Equal Protection Clause demanded in 1969 when the Supreme Court decided *McDonald v. Board of Election Commissioners*, ratification of the Twenty-First Amendment in 1971 changed the rules for age-based voting restrictions. At least with respect to voting, citizens singled out because of their age are a suspect class who have been denied a fundamental right.

As the Supreme Court has explained, "where fundamental rights and liberties are asserted under the Equal Protection Clause, classifications which might invade or restrain them must be closely scrutinized and carefully confined." *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 670 (1966). "[T]he key to discovering" whether a right is "fundamental" for purposes of strict scrutiny "lies in assessing whether" the right is "explicitly or implicitly guaranteed by the Constitution." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 33 (1973). The right to vote free from age-based discrimination is, after ratification of the Twenty-Sixth Amendment, an explicit constitutional right.

The district court erroneously thought heightened scrutiny was unnecessary here. It rested that conclusion on the fact that age classifications are not inherently suspect. That remains true with regard to most age-based classifications today, but the calculus changed with ratification of the Twenty-Sixth Amendment when it comes to voting. The famous footnote 4 in *United States v. Carolene Products* prefigured close scrutiny not only for legislation that targets "discrete and insular minorities," but also for legislation that "appears on its face to be within a specific prohibition of the Constitution." 304 U.S. 144, 152-53 n.4 (1938). That is the case here. In an equal protection challenge to an age-based voting classification after 1971, the express prohibition in the Twenty-Sixth Amendment on taking age into account demands heightened scrutiny.

Here, Section 7-15-320(B)(2) is explicitly discriminatory. It discriminates on its face on the basis of a criterion that another constitutional provision clearly prohibits. Appellants challenge the law not for the extent of the burden on voting it imposes, but for the line it draws. And because that line conflicts with an express constitutional provision, the State's discrimination can be upheld only if it survives strict scrutiny, that is, if the State carries its burden of showing that the classification is *narrowly tailored* to meet a *compelling interest* of the State.

### B. Section 7-15-320(B)(2) fails strict scrutiny.

To survive strict scrutiny under the Fourteenth Amendment, the State must meet a demanding two-part test: South Carolina must show that Section 7-15-320(B)(2) is narrowly tailored and necessary to achieve a compelling governmental interest. *Students for Fair Admissions, Inc. (SFFA) v. Pres. & Fellows of Harvard College*, 600 U.S. 181, 206-07 (2023).

In this case, as in many cases involving the Equal Protection Clause, the question is not so much whether the state has a compelling interest in its overall goal, but whether the specific lines drawn—who is included and who is excluded—are narrowly tailored and necessary to advance that state interest. The answer to that question here is that those lines are not.

The district court analyzed appellants' equal protection claim against the main governmental interest advanced by the State: minimizing the risk of voter fraud. Appellants can agree that preventing voter fraud is a compelling governmental interest. *See Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 672 (2021).[12]

---

[12] In the district court, the State also listed a governmental interest in increasing voter participation. [SEC Defs.' Mot. Summ. J. & Mem. in Supp. Filed August 30, 2024 at pp. 20. Assuming that increasing voter participation may be a compelling state interest, there is surely no governmental interest in increasing participation by some voters but not by others. And even if increasing participation only by voters over the age of sixty-five could someone be treated as a compelling interest—and appellants are quite confident it could not be—there is not even a scintilla of evidence that increasing participation among older voters somehow depends on restricting younger voters from casting absentee ballots.

But that is not the end of the inquiry. When it comes to treating voters differently on the basis of age, the State made no showing, and the district court made no finding, that this discriminatory treatment was even rationally related, let alone narrowly tailored or necessary, to that interest.

Dividing access to unrestricted mail voting at age sixty-five is not narrowly tailored to an interest in preventing fraud. The district court made no findings to support such a conclusion. Even if it *had* asked that question, the district court could not reasonably have found that the risk of voter fraud through casting absentee ballots is higher among voters under sixty-five than among those over sixty-five.[13] Indeed, common sense tells us that two forms of fraud are likely to be *higher* with mail ballots from voters over age sixty-five: the possibility that ballots have been cast in the name of dead voters or that undue influence has been exerted by taking advantage of elderly voters experiencing cognitive decline or residing in congregate living facilities. *See* Jennifer Wu, et al., *Are Dead People Voting by Mail: Evidence from Washington State Administrative Data*, Election L.J. (published ahead of print 2024), https://doi.org/10.1089/elj.2023.0047.

Therefore, because none of the risks from voter fraud are specific to voters under the age of sixty-five, South Carolina's decision to exclude these voters from no-excuse voting by mail is not narrowly tailored to advance the State's interest and therefore violates the Equal Protection Clause of the Fourteenth Amendment.

## III. THIS COURT SHOULD REMAND THIS CASE FOR REMEDIAL PROCEEDINGS.

There are at least two ways to cure the unconstitutionality of South Carolina's absentee ballot law. South Carolina might decide to allow voters of all ages to receive absentee ballots

[13] Organizations that suggest standards for protecting against absentee voter fraud do not even list age as a potential risk factor. *See, e.g.*, Heritage Found., *Factsheet: Standards for Absentee Ballots and All-Mail Elections: Doing It Right...and Doing It Wrong* (May 1, 2020), https://perma.cc/A9KJ-UQ33.

without an excuse. Conversely, it might decide to strike the no-excuse absentee ballot provision for voters over sixty-five.

The General Assembly is, of course, empowered to make a timely choice that brings the statute in line with the Twenty-Sixth and Fourteenth Amendments. But if the General Assembly fails to do so, the district court must make the decision that best serves the Constitution. All appellants ask this Court to do is to hold that Section 7-15-320(B)(2) is unconstitutional.

## Conclusion

For the reasons stated above, appellants pray for an Order reversing the judgment below and remanding this case to the district court for appropriate remedial proceedings.