No. 25-1413

# United States Court of Appeals
## for the Fourth Circuit

TRUDY B. GRANT, SARAH KRAWCHECK, NASHONDA HUNTER, MAX MILLIKEN, AND CALEB CLARK

*Plaintiffs-Appellants,*

and

JORDAN MAPP,

*Plaintiff,*

v.

HOWARD KNAPP, AS THE EXECUTIVE DIRECTOR OF THE SOUTH CAROLINA ELECTION COMMISSION, JOANNE DAY, AS A MEMBER OF THE SOUTH CAROLINA ELECTION COMMISSION; CLIFFORD J. EDLER, AS A MEMBER OF THE SOUTH CAROLINA ELECTION COMMISSION; LINDA MCCALL, AS A MEMBER OF THE SOUTH CAROLINA ELECTION COMMISSION; SCOTT MOSELEY, AS A MEMBER OF THE SOUTH CAROLINA ELECTION COMMISSION; CHARLESTON COUNTY BOARD OF ELECTIONS AND VOTER REGISTRATION; DENNIS SHEDD, CHAIRMAN OF THE SOUTH CAROLINA STATE ELECTION COMMISSION,

*Defendants-Appellees.*

---

Appeal from the United States District Court
For the District of South Carolina
At Charleston

---

**Brief of Defendants-Appellees**

---

Mary Elizabeth Crum
Tracey C. Green
Michael R. Burchstead
**BURR & FORMAN LLP**
PO Box 11390
Columbia, SC 29201
(803) 799-9800

Thomas W. Nicholson
**STATE ELECTION COMMISSION**
1122 Lady Street,
Suite 500
Columbia, SC 29201
(803) 734-9063

*Counsel for the State Election Commission and its Named Members*

John E. Robinson
**THE LAW OFFICES OF JOHN E. ROBINSON**
36 Broad Street
Charleston, SC 29401
(843) 723-5152

*Counsel for Charleston County Board of Elections and Voter Registration*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

# DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 25-1413 Caption: Trudy B. Grant, et al. v. Howard Knapp, et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Howard Knapp, as the Executive Director of the South Carolina Election Commission, Dennis Shedd (Chair),
(name of party/amicus)

JoAnne Day, Clifford J. Edler, Linda McCall, and Scott Moseley as Members of the South Carolina Election Commission

who is Appellee, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2. Does party/amicus have any parent corporations? ☐ YES ☑ NO
If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐ YES ☑ NO
If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: s/Tracey C. Green Date: May 2, 2025

Counsel for: Appellee



Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 25-1413 Caption: Trudy Grant v. Howard Knapp Et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Charleston County Board of Voter Registration and Elections
(name of party/amicus)

who is appellee, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2. Does party/amicus have any parent corporations? ☐ YES ☑ NO
If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐ YES ☑ NO
If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: s/ John E. Robinson Date: 5/20/25

Counsel for: Charleston County Board of Voter Re



Print to PDF for Filing

## Table of Contents


Table of Authorities .......... iii

Jurisdictional Statement .......... 1

Statement of the Issues .......... 1

Introduction .......... 2

Statement of the Case .......... 4

1. Statement of Facts. .......... 4
2. Procedural History .......... 5
3. Ruling presented for review. .......... 6

Summary of Argument .......... 7

Argument .......... 10

Standard of Review .......... 10

Analysis .......... 11

1. Section 7-15-320(b)(2) does not abridge Appellants' right to vote under the Twenty-Sixth Amendment. .......... 11
   - A. The right to vote extended by the Twenty-Sixth Amendment is the right to exercise the franchise, not a right to a more convenient form of casting a ballot. .......... 14
     - i. The commonly understood meaning of the Twenty-Sixth Amendment's text at the time it was adopted demonstrates that the right to vote does not include the manner by which a ballot is cast. .......... 14
     - ii. The history leading up to adoption of the Twenty-Sixth Amendment demonstrates that the amendment does not extend as broadly as Appellants would like. .......... 17
     - iii. The legislative history behind the Twenty-Sixth Amendment also demonstrates that the Amendment does not extend as broadly as Appellants would like. .......... 21
     - iv. Judicial decisions rendered contemporaneous with adoption of the Twenty-Sixth Amendment demonstrate that the amendment does not extend to elevate absentee voting to a constitutional right. .......... 27

v. Decisions of federal courts of appeals that have considered claims like those made by Appellants have also concluded that the Twenty-Sixth Amendment does not extend to eliminate age-based distinctions in the manner of voting ..... 30

B. Enactment of the Twenty-Sixth Amendment does not require this Court to apply strict scrutiny in evaluating Appellants' claims. ..... 32

C. The Twenty-Sixth Amendment should not be read in accord with the jurisprudence of the Fifteenth, Nineteenth, and Twenty-Fourth Amendments. ..... 39

D. Summary of the Twenty-Sixth Amendment argument. ..... 43

2. Section 7-15-320(B)(2) does not violate the Equal Protection Clause of the Fourteenth Amendment. ..... 44

Conclusion ..... 51

## Table of Authorities

**Page(s)**

**Cases**

*Anderson v. Celebrezze*,
460 U.S. 780 (1983) .......... 37, 46, 47

*Brnovich v. Democratic Nat'l Comm.*,
594 U.S. 647 (2021) .......... 38, 45, 50

*Burdick v. Takushi*,
504 U.S. 428 (1992) .......... *passim*

*Ciscino v. Nelson*,
2023 WL 5769414 (5th Cir. 2023) .......... 30

*Clements v. Fashing*,
457 U.S. 957 (1982) .......... 44

*Clingman v. Beaver*,
544 U.S. 581 (2005) .......... 47, 48

*Common Cause Indiana v. Lawson*,
977 F.3d 663 (7th Cir. 2020) .......... 29

*Crawford v. Marion Cnty. Election Bd.*,
553 U.S. 181 (2008) .......... 12, 37, 38, 45

*District of Columbia v. Heller*,
554 U.S. 570 (2008) .......... 14

*Dyer v. Huff*,
382 F. Supp. 1313 (D.S.C. 1973) .......... 30

*Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Aurelius Inc., LLC*,
590 U.S. 448 (2020) .......... 15

*Goodyear Atomic Corp. v. Miller*,
486 U.S. 174 (1988) .......... 27

*Gregory v. Ashcroft*,
501 U.S. 452 (1991) .......... 33

*Greidinger v. Davis*,
988 F.2d 1344 (1993) .......... 45

*Griffin v. Roupas*,
385 F.3d 1128 (7th Cir. 2004) .......... 29

*Harman v. Forssenius*,
380 U.S. 528 (1965) .......... 49

*Harper v. Va. State Bd. of Elections*,
383 U.S. 663 (1966) .......... 36, 37

*Kimel v. Florida Bd. of Regents*,
528 U.S. 62 (2000) .......... 39, 40

*Kovacs v. Cooper*,
336 U.S. 77 (1949) .......... 34

*Kramer v. Union Free Sch. Dist. No. 15*,
395 U.S. 621 (1969) .......... 29, 30

*Lee v. Va. State Bd. of Educ.*,
843 F.3d 592 (4th Cir. 2016) .......... 30, 41, 42

*Libertarian Party of Va. v. Alcorn*,
826 F.3d 708 (4th Cir. 2016) .......... 48

*Massachusetts Bd. of Retirement v. Murgia*,
427 U.S. 307 (1976) .......... 35, 36

*Mays v. LaRose*,
951 F.3d 775 (6th Cir. 2020) .......... 28

*McDonald v. Bd. of Election Comm'rs of Chicago*,
394 U.S. 802 (1969) .......... *passim*

*Middleton v Andino*,
990 F.3d 768 (4th Cir. 2020) .......... 50



62396961 v1

*Nelson v. Warner*,
12 F.4th 376 (4th Cir. 2021) ........................................................ 48

*Oregon v. Mitchell*,
400 U.S. 112 (1970) ................................................ 19, 20, 27

*Purcell v. Gonzalez*,
549 U.S. 1 (2006) .......................................................................... 9, 51

*Richardson v. Texas Sec'y of State*,
978 F.3d 220 (5th Cir. 2020) ........................................................ 28

*San Antonio Indep. Sch. Dist. v. Rodrigues*,
411 U.S. 1 (1973) ................................................................ 35, 36

*Sheet Metal Workers' Health & Welfare Fund of N. Carolina v. Stromberg Metal Works, Inc.*,
118 F.4th 621 (4th Cir. 2024) ........................................................ 10

*Smiley v. Holm*,
285 U.S. 355 (1932) ................................................ 8, 13, 14

*Strawn v. AT&T Mobility, LLC*,
530 F.3d 293 (4th Cir. 2008) ........................................................ 27

*Tex. Democratic Party v. Abbott*,
961 F.3d 389 (5th Cir. 2020) ........................................ 16, 30, 32

*Tex. Democratic Party v. Abbott*,
978 F.3d 168 (5th Cir. 2020) ............................................ 2, 6, 32

*Tully v. Okeson*,
78 F.4th 377 (7th Cir. 2023) ................................... 7, 15, 30, 32

*Tully v. Okeson*,
977 F.3d 608 (7th Cir. 2020) ....................................... 2, 6, 32, 44

*U.S. v. Carmichael*,
685 F.2d 901 (4th Cir. 1982) ........................................................ 50

*U.S. v. Carolene Prods. Co.*,
304 U.S. 144 (1938) ................................................................ 34, 35



62396961 v1

*U.S. v. Olson*,
473 F.2d 686 (8th Cir. 1973) .......... 31

*Veasey v. Abbott*,
830 F.3d 216 (5th Cir. 2016) .......... 7, 29

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
429 U.S. 252 (1977) .......... 41

*Walgren v. Board of Selectmen of Town of Amherst*,
519 F.2d 1364 (1st Cir. 1975) .......... 30

*We CBD, LLC v. Planet Nine Priv. Air, LLC*,
109 F.4th 295 (4th Cir. 2024) .......... 10

**Constitutional Provisions**

S.C. Const. art. II, § 10 .......... 13, 14

U.S. Const. amend. XIV, § 2 .......... 40

U.S. Const. amend. XXVI .......... 12

U.S. Const. art. I, § 4 .......... 7, 13, 14

U.S. Const. art. VI, ¶2 .......... 21

**Statutes**

28 U.S.C. § 1291 .......... 1

28 U.S.C. § 1331 .......... 1

28 U.S.C. § 1343(a)(4) .......... 1

S.C. Code Ann. § 7-15-320 .......... 4

S.C. Code Ann. § 7-15-320(B)(2) .......... *passim*

Voting Rights Act Amendments of 1970, Pub. L. 91-285, 84
Stat. 314 (1970) .......... 18, 19

## Legislative Materials

88 Cong. Rec. (1942) .......... 17

117 Cong. Rec. (1971) .......... 24, 25, 26

H.R. Rep. No. 92-37 (1971) .......... 21, 22, 23

*Lowering the Voting Age to 18: A Fifty-State Survey of the Costs and Other Problems of Dual-Age Voting*, 92d Cong. (Feb. 1971) .......... 21

*Lowering the Voting Age to 18: Hearings before the Constitutional Amendments Subcommittee of the Senate Judiciary Committee*, 91st Cong. 2-3 (1970) .......... 17, 18

*Passage and Ratification of the Twenty-Sixth Amendment: Report of Constitutional Amendments Subcommittee to the Committee on the Judiciary*, 92nd Cong. 8-12 (Sept. 1971) .......... 22

S.J. Res. 7 .......... 22

S.J. Res. 166, 77th Congress (1942) .......... 17

S. Rep. No. 92-26 .......... *passim*

## Rules

Fed. R. Civ. P. 12(c) .......... 5

Fed. R. Civ. P. 12(d) .......... 5

Fed. R. Civ. P. 56 .......... 5, 10

Fed. R. Civ. P. 56(a) .......... 10

## Other Authorities

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 69 (2012) .......... 15

BLACK'S LAW DICTIONARY, Rev. 4th Ed. (1968) .......... 16

Louis Lusky*, Footnote Redux: A* Carolene Products *Reminiscence*, 82 Colum. L. Rev. 1093, 1101-03 (1982)......................34

South Carolina Executive Order No. 2007-07 ........................................50

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1971).............. 15, 16

## Jurisdictional Statement

The district court had subject matter jurisdiction over Appellants' claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4). The district court issued its Order on March 27, 2025, disposing of all of Plaintiffs' claims. Plaintiffs filed their notice of appeal on April 15, 2025. This Court has jurisdiction to review the Order pursuant to 28 U.S.C. § 1291.

## Statement of the Issues

1. The Twenty-Sixth Amendment lowers the voting age to 18 and prohibits a state from denying or abridging a citizen's right to vote because of age. The Twenty-Sixth Amendment was adopted after the Supreme Court held that Congress could not by statute reduce the state voting age to 18. Congress has the power to enact legislation enforcing the Amendment but has not done so, especially with respect to absentee ballots. Pursuant to its federal and state constitutional obligation and authority to regulate the time, places, and manner of voting, South Carolina allows voters aged 65 and older to vote absentee without excuse. S.C. Code Ann. § 7-15-320(B)(2). Although they have been able to vote in every election in which they were eligible, Appellants—all of whom are younger than age 65—contend that their Twenty-Sixth Amendment rights have been violated because they cannot vote absentee without excuse as can voters aged 65 and older. Did the district court correctly determine that § 7-15-320(B)(2) does not violate the Twenty-Sixth Amendment because absentee voting is a convenience and limiting excuse-free absentee voting to persons aged 65 and older does not impair Appellants' fundamental right to vote?

2. While the right to vote is fundamental for purposes of the Fourteenth Amendment, "[i]t does not follow, however, that the right to vote in any manner . . . [is] absolute." *Burdick v. Takushi,* 504 U.S. 428, 433 (1992). Appellants proceed under the "erroneous

assumption that a law that imposes any burden upon the right to vote must be subject to strict scrutiny"; however, [the Supreme Court] cases do not so hold." *Id.* at 432. Did the district court correctly determine that, regardless of whether the statute is reviewed under a rational basis standard or the *Anderson/Burdick* balancing-of-interest test, § 7-15-320(B)(2) "passes muster" under the Equal Protection Clause of the Fourteenth Amendment?

## Introduction

Although it was ratified more than 44 years ago, on July 1, 1971, there is a dearth of law interpreting or applying the Twenty-Sixth Amendment to state voting laws, including absentee voting requirements. Both the Fifth and Seventh Circuit Courts of Appeals have rejected challenges to state laws that allow only voters aged 65 and older to vote absentee without excuse. *Tully v. Okeson,* 977 F.3d 608 (7th Cir. 2020); *Tex. Democratic Party v. Abbott,* 978 F.3d 168 (5th Cir. 2020). This Court should reject Appellants' claims as well.

Appellants are residents of and registered voters in Charleston and Berkeley Counties, South Carolina, each of whom are younger than 65. South Carolina Code § 7-15-320(B)(2) allows persons aged 65 or older to vote absentee without excuse. Despite the fact that each has successfully voted in South Carolina elections, *see* (JA68-96; JA103-114), Appellants contend that § 7-15-320(B)(2) is facially unconstitutional because it

abridges their right to vote under the Twenty-Sixth Amendment and denies equal protection under the Fourteenth Amendment by not affording them the same absentee voting privileges that voters 65 and older have.

The district court correctly rejected Appellants' claims, ruling that: 1) § 7-15-320(B)(2) is a proper exercise of the States delegated authority to establish the manner of voting; 2) the Twenty-Sixth Amendment simply lowered the age to vote in all elections to 18-years old and older; and 3) the jurisprudence applicable to the Fifteenth, Nineteenth, and Twenty-Fourth Amendments does not extend to the Twenty-Sixth Amendment. The district court also correctly determined that the rational relationship test applies and requires rejecting Appellants' Equal Protection claims because § 7-15-320(B)(2) does not affect Appellants' fundamental right to vote and is rationally related to the State's legitimate interests in preventing voter fraud and ensuring legitimate and orderly elections. The district court alternatively and correctly determined that even if Appellants' Equal Protection claims are subject to the higher *Anderson/Burdick* scrutiny, § 7-15-320(B)(2) is nevertheless valid. The Order should be affirmed.

## Statement of the Case

### 1. Statement of Facts.

Title 7, Chapter 15 of the South Carolina Code of Laws governs absentee voting in South Carolina. Pertinent to this case, § 7-15-320(B)(2) authorizes persons aged 65 and older to vote absentee without further excuse.[1] Absentee voting occurs only by mail.

Appellants are registered South Carolina voters. All are under age 65. Each Appellant, except Krawcheck,[2] has been able to vote early, on election day, or by absentee ballot. Thus, although they do not qualify to vote absentee under § 7-15-320(B)(2), none of the Appellants have ever been unable to vote because the age 65 absentee voting privilege is unavailable to them. *See* (JA49-50 (Grant)); (JA60-62 (Hunter)); (JA66-69 (Milliken)); and (JA72-74 (Clark)).

---

1 Section 7-15-320 establishes other categories for absentee voting based on employment; illness; incarceration; physical condition; absence from the county of residence on Election Day; voters serving in the armed forces or merchant marines, including their spouses and defendants; and hospitalized persons. All of those categories would be available to Appellants if they otherwise met the statutory requirements.

2 Krawcheck first registered to vote in 2023 and had not voted in South Carolina at the time of the hearing. (JA54-56).

## 2. Procedural History

Appellants filed their Second Amended Complaint on May 30, 2024. (JA23-28). In the Complaint, Appellants contended that their rights under the Twenty-Sixth and Fourteenth Amendments were violated because they do not have the same statutory right to vote absentee as do persons aged 65 and older. The County Board timely filed its Answer on March 5, 2024, denying Appellants' claims. (JA18-22). The Election Commission timely filed its Answer to the Second Amended Complaint on June 12, 2024, also denying Appellants' claims. Pursuant to a scheduling order, the parties conducted discovery, after which Appellants filed a motion for judgment on the pleadings on August 1, 2024. (JA43); *see* Fed. R. Civ. P. 12(c). On August 30, 2024, the Election Commission moved for summary judgment. (JA45); *see* Fed. R. Civ. P. 56. On September 9, 2024, Appellants filed a Federal Rule of Civil Procedure 12(d) notice, consenting to the district court considering their Rule 12(c) motion as a Rule 56 motion if it did not exclude matters outside the pleadings presented by the County Board and the Election Commission. *See* (JA79-80; JA96, n.2). The district court agreed to consider Appellants' Motion under Rule 56. (JA96, n.2).

The district court heard arguments on the motions on February 24, 2025, and issued its order granting summary judgment against the Appellants. Appellants timely appealed from the district court's order on April 15, 2025. (JA117).

**3. Ruling presented for review.**

The ruling presented for review is the March 27, 2025 Order granting summary judgment to Appellees and denying summary judgment to Appellants on the Twenty-Sixth, Fourteenth, and First Amendment[3] claims. The district court considered the parties' arguments, but determined that the "right to vote" extended to persons aged 18 and older by the Twenty-Sixth Amendment does not prohibit a state from restricting excuse-free absentee voting privileges to persons aged 65 and older. (JA109-110). The court in large part relied on the reasoning in *McDonald v. Board of Election Commissioners of Chicago*, 394 U.S. 802 (1969); *Abbott,* 978 F.3d at 168; and *Tully,* 977 F.3d at 608. (JA104-110). Importantly, the court noted that § 7-15-320(B)(2) does not "in any way deny Plaintiffs the exercise of the franchise" and "does not

[3] Appellants did not appeal from the rejection of their First Amendment claims by the district court.

impose any burden on Plaintiffs, let alone an onerous burden (nor do they contend it does)." (JA109).

The district court also rejected Appellants' Equal Protection and First Amendment claims based in large part on *McDonald*, *Abbott*, and *Tully*. (JA110-113). The court also considered application of the *Anderson/Burdick* test, *see* discussion *infra* at 48-53, in rejecting Appellants' claims. (JA111-113). The court concluded that, "regardless of whether it is reviewed under a rational basis standard or the *Anderson/Burdick* balancing-of-interests test, South Carolina's absentee voting law passes muster." (JA114). The court therefore denied Appellants' motion for summary judgment and granted Appellees' motion for summary judgment. (JA114-115 & n.21).

## Summary of Argument

The Constitution delegates to the states the authority to regulate the "time, places and manner" of elections, except as may be regulated by Congress. U.S. Const. art. I, § 4. In construing this provision, the Supreme Court held:

> It cannot be doubted that these comprehensive words embrace authority to provide a *complete code for congressional elections*, not only as to times and places, but in relation to notices, registration, supervision of voting, protection of

> voters, *prevention of fraud and corrupt practices*, counting of votes, duties of inspectors and canvassers, and making and publication of election returns; in short, to enact the numerous requirements as to procedure and safeguards which experience shows are necessary in order to enforce the fundamental right involved. . . . *All this is comprised in the subject of "times, places and manner of holding elections,"* . . . .

*Smiley v. Holm*, 285 U.S. 355, 366 (1932) (emphasis added).

Appellants challenge § 7-15-320(B)(2) as violating the Twenty-Sixth Amendment, but not because they have been denied the right to vote—each has successfully voted. Rather, they challenge it because they do not have the same access to non-excuse absentee voting as do voters aged 65 and over. Appellants also challenge § 7-15-320(B)(2) as violating the Fourteenth Amendment for the same reasons.

The district court correctly rejected Appellants' Twenty-Sixth Amendment arguments. The "right to vote" protected by the Twenty-Sixth Amendment is the right to cast one's ballot. Both the contemporaneous meaning of the "right to vote" and the legislative history of the Amendment demonstrate that the "right to vote" is the ability of a voter to cast a ballot; *i.e.* to exercise the franchise, nothing more. The Amendment does not extend that right to the manner of voting, the regulation of which is left to the States. Neither does the jurisprudence applicable to the Fifteenth, Nineteenth and

Twenty-Fourth Amendments extend to the Twenty-Sixth Amendment; even if it does, Appellants have not established that the State intended to discriminate on the basis of age in enacting § 7-15-320(B)(2). And, finally, age is not a suspect class and adoption of the Twenty-Sixth Amendment did not make it so for voting.

The district court also correctly rejected Appellants' Fourteenth Amendment arguments. While the State recognizes that older voters generally may have difficulty accessing the polls, it also has a substantial interest in preventing fraud. *See Purcell v. Gonzalez,* 549 U.S. 1, 4 (2006) ("A State indisputably has a compelling interest in preserving the integrity of its election process."). As such, setting the no-excuse absentee voting right at 65 and older is rationally related to the State's vital interest in preventing voter fraud and the conduct of elections that are orderly and in which the citizenry have confidence. And even if a higher standard applies to Appellants' age-based claims, § 7-15-320(B)(2) is constitutional under the *Anderson/Burdick* analysis because of the State's substantial interest in protecting the voting process versus any *de minimis* impact on persons under 65. Thus, under either the rational relationship or *Anderson/Burdick* balancing tests, the State's interest in

maintaining fair and orderly elections outweighs any slight inconvenience Appellants may incur in not having the ease of voting under § 7-15-320(B)(2)—although they may, and some Appellants have, exercised the franchise under other absentee provisions.

## Argument

## Standard of Review

"This Court reviews de novo a district court's disposition of cross-motions for summary judgment." *Sheet Metal Workers' Health & Welfare Fund of N. Carolina v. Stromberg Metal Works, Inc.*, 118 F.4th 621, 631 (4th Cir. 2024). "When cross-motions for summary judgment are before a court, the court examines each motion separately, employing the familiar standard under" Federal Rule of Civil Procedure 56. *Id.* (cleaned up); *see also We CBD, LLC v. Planet Nine Priv. Air, LLC*, 109 F.4th 295, 301 (4th Cir. 2024) ("In conducting our de novo review of a summary judgment award, we apply the same legal standards as those applied by the district court."). Under that standard, a movant is entitled to summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Stromberg Metal Works*, 118 F.4th at 631.

## Analysis

As the district court correctly recognized, the right to vote does not extend to the manner in which a ballot is cast. Accordingly, neither the Twenty-Sixth nor the Fourteenth Amendment requires extending excuse-free absentee voting to persons under age 65. As such, § 7-15-320(B)(2) does not deny or abridge or deny Appellant's right to vote in violation of either the Twenty-Sixth Amendment or the Fourteenth Amendment.

### 1. Section 7-15-320(b)(2) does not abridge Appellants' right to vote under the Twenty-Sixth Amendment.

Appellants' primary challenge to § 7-15-320(B)(2) is based on the Twenty-Sixth Amendment, which provides as follows:

> Section 1. The right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied[4] or abridged by the United States or by any State on account of age.
>
> Section 2. The Congress shall have power to enforce this article by appropriate legislation.[5]

---

[4] To be sure, neither Appellants nor Amicus allege that § 7-15-320(B)(2) denies the right to vote; they just claim that the statute abridges that right.

[5] In the 54 years since the Amendment was ratified, Congress has not enacted any legislation enforcing the Amendment.

U.S. Const. amend. XXVI. The Amendment was ratified on July 1, 1971, and grants the same voting rights to persons as young as 18 as those already held by persons 21 and older. The question for this Court, decided against Appellants by the district court, is the scope of the right to vote.

It is undisputed that Appellants were not and are not precluded from voting on Election Day because they were ineligible for the age 65 absentee voting privilege. Appellants in fact acknowledge that each has the right to vote in person on Election Day, to participate in early voting, and to vote by mail if they fall within one of the eight qualifying exceptions. *See* (JA25-26 ¶¶ 12 & 14). Thus, Appellants at bottom argue that the Twenty-Sixth Amendment affords them a constitutional right to the "particularly convenient" method of voting by mail without excuse that § 7-15-320(B)(2) affords to persons aged 65 and older. (JA24 ¶ 6(b)).

But the privilege of voting absentee is not a right that the Twenty-Sixth Amendment was intended or understood to afford voters. *See Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 209 (2008) (Scalia, J., concurring in the judgment) ("That the State accommodates some voters by permitting (not requiring) the casting of absentee or provisional ballots, is an indulgence—not a constitutional imperative

that falls short of what is required."). A state therefore may regulate the ages when absentee voting becomes an option under its right to manage the "times, places and manner of elections." U.S. Const. art. I, § 4; *Smiley,* 285 U.S. at 366; *see also* S.C. Const. art. II, § 10 ("The General Assembly shall . . . regulate the time, place and manner of elections [and] provide for the administration of elections and for absentee voting . . . .").

Finally, even assuming that the Twenty-Sixth Amendment transforms age into a suspect class for voting purposes, as Appellants assert, and the exercise of absentee voting is subsumed within the right to vote—neither of which is correct—the State has a compelling interest in regulating absentee voting and assuring, to the extent possible, orderly, fair, and fraud free elections in which the South Carolina electorate has confidence. This compelling interest more than outweighs any *de minimis* impact on Appellants that may result from limiting absentee voting to persons aged 65 and older. And contrary to Appellants' claim, § 7-15-320(B)(2) is narrowly tailored to otherwise qualified voters 65 and older.

### A. *The right to vote extended by the Twenty-Sixth Amendment is the right to exercise the franchise, not a right to a more convenient form of casting a ballot.*

The right to vote is just that—the ability to exercise the franchise by casting a vote without material burden and having it count. However, exercising the right to vote by casting an absentee ballot is part of the manner of voting, which is left to regulation by the states. U.S. Const. art. I, § 4; *Smiley*, 285 U.S. at 366; *see also* S.C. Const. art. II, § 10. Appellants claim that "[t]he straightforward reading of [the Amendment] text forbids states from treating voters differently, *in any way, and in any aspect of the voting process*, based on their age." Appellants' Br. at 10 (emphasis added). But Appellants misapprehend the breadth of the right to vote encompassed within the Twenty-Sixth Amendment.

#### i. *The commonly understood meaning of the Twenty-Sixth Amendment's text at the time it was adopted demonstrates that the right to vote does not include the manner by which a ballot is cast.*

In evaluating Appellants' claim that the Twenty-Sixth Amendment elevates absentee voting to a constitutional right, it is necessary to consider the original meaning of the amendment at the time of its adoption. *District of Columbia v. Heller*, 554 U.S. 570, 634–35 (2008) ("Constitutional rights are enshrined with the scope they were

understood to have when the people adopted them."); *Tully*, 78 F.4th at 383; *see Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Aurelius Inc., LLC*, 590 U.S. 448, 462 (2020). This requires considering the common meaning of the terms used in the Twenty-Sixth Amendment in 1971. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 69 (2012) ("[E]very word employed in the constitution is to be expounded in its plain, obvious, and common sense, unless the context furnishes some ground to control, qualify, or enlarge it. . . . They are instruments of a practical nature, founded on the common business of human life, adapted to common wants, designed for common use, and fitted for common understandings.") (citation omitted).

Dictionary definitions dating from the time the Twenty-Sixth Amendment was adopted establish that Appellants' claims are not founded in the original understanding of the amendment. The word "vote" was defined as: "1 a: a usu. Formal expression of opinion or will in response to a proposed decision; *esp* : one given as an indication of approval or disapproval of a . . . candidate for office." *Webster's Third New International Dictionary* 1971 at 2565. "Vote" was defined as "1 : to express one's views in response to a poll . . . *esp* : to exercise a political

franchise . . . .” *Id.* In 1968, “franchise” was defined as: “[a] special privilege conferred by government on individual or corporation, and which does not belong to citizens of country generally of common right . . . . Elective Franchise. The right of suffrage: the right or privilege of voting in public elections.” *Black’s Law Dictionary*, Rev. 4th Ed., p. 786 (1968) (emphasis omitted); *see Webster’s Third* at 902 (“franchise . . . b : a constitutional or statutory right or privilege; *esp* the right to vote . . . .”). And a “right” was defined as “d (1) : a power or privilege vested in a person by the law to demand action or forbearance at the hands of another . . . : a capacity or privilege the enjoyment of which is secured to a person by law.” *Id.* at 1955. “Abridge” was defined “b : to diminish (as a right) by reducing <the danger of abridging the liberties of the people –Abraham Lincoln>.” *Id.* at 6.

In sum, when the Twenty-Sixth Amendment was adopted and ratified in 1971, the phrase “right to vote” was commonly understood to mean the right to formally express one’s opinion by casting a ballot. Thus, the Twenty-Sixth Amendment simply lowered the age at which a person may cast a ballot to 18. *See Tex. Democratic Party v. Abbott*, 961 F.3d 389, 408 (5th Cir. 2020). (“[T]here is plenty of evidence that the Amendment’s

most immediate purpose was to lower the voting age from twenty-one to eighteen."). There is no contemporaneous evidence credibly suggesting any understanding that the Twenty-Sixth Amendment restricted the states' authority and obligation to regulate the time, place, and manner of casting that ballot. As such, § 7-15-320(B)(2) is constitutional.

ii. *The history leading up to adoption of the Twenty-Sixth Amendment demonstrates that the amendment does not extend as broadly as Appellants would like.*

The history surrounding the Twenty-Sixth Amendment fully demonstrates that Congress understood the amendment to do no more than extend the voting franchise to voters as young as 18 years old. In fact, the Twenty-Sixth Amendment was the culmination of efforts that began during World War II, when the draft age was lowered to 18. S. Rep. No. 92-96 at 4 (1971). The argument, of course, was that a person old enough to be drafted should be allowed to vote. *Id*. at 10.[6] Efforts to lower the voting age continued through the 1950s, including proposals supported by Presidents Eisenhower, Kennedy, and Johnson. *Lowering the Voting Age to 18: Hearings before the Constitutional Amendments*

---

[6] In 1942, Senator Arthur Vandenburg proposed an amendment that mirrors today's Twenty-Sixth Amendment. *See* S.J. Res. 166, 77th Congress (1942); 88 Cong. Rec. 8312, 8316 (1942).

*Subcommittee of the Senate Judiciary Committee*, 91st Cong. 2-3 (1970). In addition to the draft-focused argument, proponents argued that more readily available media and expanded public education meant younger people would be sufficiently informed to vote at an earlier age than previous generations had been. *Id.* at 24.

The focus on lowering the voting age entered center stage in the late 1960s, when the Vietnam War became a flashpoint in American public life. However, it was more than the war motivating the increased support for lowering the voting age. Other oft-repeated arguments made at the time were that young voters are mature enough to vote and already bear most of the other responsibilities of citizenship, and because society would benefit as a whole from their participation in the political process. S. Rep. No. 92-26 at 7.

As part of the Voting Rights Act Amendments of 1970, Pub. L. 91-285, 84 Stat. 314 (1970), Congress provided in pertinent part that

> no citizen of the United States who is otherwise qualified to vote in any State or political subdivision in any primary or any election shall be denied the right to vote in any such primary or election on account of age if such citizen is eighteen years of age or older.

*Id.* § 302, 84 Stat. at 318; *see also* S. Rep. No. 92-26 at 8-10 (detailing how the Senate decided to lower the voting age by statute). Although, with the 1970 amendments, Congress established residency requirements and provided uniform absentee ballot requirements for all voters voting for presidential/vice presidential electors, it did not attempt to exert control over absentee voting for all elections—only to elections for presidential and vice-presidential electors. More importantly for this case, Congress did not impose absentee voting requirements for all state and federal elections and it did not evince any intent to expand age-based absentee voting. In short, other than seeking to lower the voting age to 18 for all federal and state elections and to permit absentee voting for president and vice-president, Congress did not otherwise seek to interfere with states' authority to regulate the manner of elections.

A number of states immediately challenged Congress' reduction of the voting age in state elections "because they believe[d] that the Act [took] away from them powers reserved to the States by the Constitution to control their own elections." *Oregon v. Mitchell*, 400 U.S. 112, 117

(1970) (plurality opinion).[7] The constitutional proposal to lower the voting age to 18 was put on hold after passage of the VRA Amendments, "pending the outcome of the Supreme Court test" in *Oregon*. S. Rep. No. 92-26 at 5. A plurality of the Supreme Court in *Oregon* held that the 18-year-old voter provisions of the Act were constitutional and enforceable for federal elections but not state and local elections. *Id.* at 118. The Court also upheld the residency and absentee voting requirements as to election of presidential and vice presidential electors. *Id.* at 119.

Thus, after *Oregon*, states were faced with implementing different requirements for federal and state elections. The Senate expressed a concern that

> The administrative problems of creating and maintaining a system of dual-age voting led election officials to raise the danger of profound confusion and delay in the election process. In the 47 States which had not yet extended the franchise to 18-year-olds, separate systems of registration

---

[7] Appellants misapprehend the analysis in *Oregon* when they argue that it "confirms that absentee voting is an integral part of the 'right to vote." As stated, Title I of the Voting Rights Act of 1970 extended the "right to vote" to 18- to 20-year olds only for presidential and vice presidential electors. By enacting Title III to make uniform the absentee requirements, Congress recognized that the right to vote did not include absentee voting—thus enacting legislation specifically to cover absentee voting.

> and voting had to be established for nearly 10 percent of the previous voting age population-more than 10 million young people.

S. Rep. No. 92-26 at 10. The Senate was not only worried about confusion, delay, and the expense the states would have to incur, but also "the danger of fraud" that could result from that system. *Id.* at 12. The House expressed the same concerns. H.R. Rep. No. 92-37 at 5.

To ameliorate this "dual election" problem and effectuate lowering the voting age to 18 for all federal and state elections, Congress passed the Twenty-Sixth Amendment in March 1971. By June 1971, 38 states had ratified it and it thereafter became part of the "supreme Law of the Land." U.S. Const. art. VI, ¶2.

iii. *The legislative history behind the Twenty-Sixth Amendment also demonstrates that the Amendment does not extend as broadly as Appellants would like.*

As the records from the legislative history overwhelmingly demonstrate, the *Oregon* decision was at the center of the Twenty-Sixth Amendment debate. *See* S. Rep. No. 92-26 at 5, 10-18; H.R. Rep. No. 92-37 at 2-8, 21-25; *Lowering the Voting Age to 18: A Fifty-State Survey of the Costs and Other Problems of Dual-Age Voting*, 92d Cong. (Feb. 1971) (report by Senator Bayh, Subcommittee Chairman, to the Committee on

the Judiciary, United States Senate); *Passage and Ratification of the Twenty-Sixth Amendment: Report of Constitutional Amendments Subcommittee to the Committee on the Judiciary*, 92nd Cong. 8-12 (Sept. 1971) (report by Senator Bayh, Subcommittee Chairman, to the Committee on the Judiciary, United States Senate). In other words, Congress had attempted to enact by statute a uniform voting age of 18 for all federal and state elections. The *Oregon* court rejected that effort and that is the situation that Congress sought to rectify through a constitutional amendment. There was no effort or goal to expand voting rights to include all manner of voting, such as absentee voting.

The language used by Congress with respect to enacting the Twenty-Sixth Amendment demonstrates its narrow focus. The titles of both the Senate and House of Representatives Committee Reports on the Amendment, S.J. Res. 7, state: "LOWERING THE VOTING AGE TO 18"). S. Rep. No. 92-26 & H.R. Rep. No. 92-37. The Senate Subcommittee on Constitutional Amendments held "[c]omprehensive hearings that focused on the merits of a constitutional amendment to lower the minimum voting age . . . ." S. Rep. No 92-26 at 2; H.R. Rep. No. 93-37 at 4. The Senate Report recommended passing the resolution approving the

Amendment "extending the right to vote to citizens 18 years of age or older." S. Rep. No. 92-26 at 1; *see also* H.R. Rep. No. 92-37 at 1. The Committee Reports are replete with references to the extension of the franchise or lowering of the voting age to those under 21 years of age. S. Rep. No 92-26 *passim*; H.R. Rep. No. 92-37 *passim*. The supporters of the measure were firmly focused on the class of people who stood to benefit from extending the franchise: the 10 to 12 million young people who were 18, 19, and 20 years old. S. Rep. No. 92-26 at 4, 6, & 12. The Senate Judiciary Committee stated: "[T]he time has come to lower the voting age to 18 in every election across the land—because it is right." S. Rep. No. 92-26 at 18.

What these reports lack is evidence of any Congressional intent to expand voting rights to encompass manner of voting. Simply put, Congress intended to extend voting rights to 18, 19, and 20 year olds, not create new constitutional rights for voters of all ages. Nor was there any contemplation by Congress that this amendment would affect absentee voting. The word "absentee" appears nowhere in the House Report, and it only appears in the Senate Report in the context of a concern that a

few states were considering requiring young voters to vote *only* absentee to ameliorate the "dual age voting" problem. S. Rep. No. 92-26 at 14.

The debate on the Amendment in both the Senate and House further demonstrates that Congress intended for the Twenty-Sixth Amendment to extend the voting franchise to 18 year olds, not to usurp the states' historic authority to regulate the time, places, and manner of elections. *See, e.g.*, S. Rep. No 92-26 *passim*; *see also, e.g.*, 117 Cong. Rec. 7540 (Rep. Wiggins) ("The amendment is addressed to the single political act of voting . . . . A qualified voter in any election is a qualified voter in all elections."). Given the reaction by a number of states when Congress statutorily lowered the voting age to 18 for all elections, it is impossible to conclude that those states would have sat silently by if the Twenty-Sixth Amendment had been understood to take away a state's ability to set reasonable conditions on the manner of voting. Moreover, it is difficult to conclude that so many states would have acted to ratify the new amendment so quickly.

To be sure, Appellants selectively choose parts of the legislative history to support their arguments. For instance, Appellants misconstrue the House Report's "declaration" that "'[t]he section contemplates that

the term "vote" includes all actions necessary to make a vote effective in any primary, special or general election,' including 'casting a ballot.'" Appellants' Br. at 3. However, that extract from the House Report is taken out of context. Representative Celler, who was chairman of the House Judiciary Committee and led the floor debate in favor of the Amendment, began his remarks by saying "a continuing question has occupied the attention of Americans: Who, among our citizens shall be eligible to participate as voters." 117 Cong. Rec. 7532.

A review of the full text of Representative Celler's statement is instructive in analyzing Appellants' arguments. During Representative Celler's analysis of the resolution as part of the floor debate, he stated as follows:

> [Section 1 of the proposed Twenty-Sixth Amendment] contemplates that the term "vote" includes all action necessary to make a vote effective in any primary, special or general election including, but not limited to, registration or other action required by law prerequisite to voting, casting a ballot, or having such ballot counted properly and included in the totals of votes cast with respect to candidates for public or party office and propositions for which votes are received in an election.

*Id.* at 7533. Thus, Appellants' quote omits critical explanatory language: "including but not limited to registration or other action required by law

*prerequisite to voting*" and "votes cast with respect to candidates for public or party office and propositions for which votes are received in an election." *Id.* (emphasis added).

Thus, the statement cited by Appellants in fact does not support their argument because Representative Celler was addressing the need to extend the "prerequisite[s] of voting" to those 18 years of age. Absentee voting is certainly not a "prerequisite to voting"; rather, it is a manner of voting. Being able to vote for candidates for office, public or party, and on election propositions is being able to participate in the political process. As Representative Celler stated, "the proposed 26th Amendment is part of a constitutional tradition of enlarging participation in our political process." *Id.*; *see also, e.g.*, 117 Cong. Rec. 1735 (stating that the "right to vote" embraces the entire political process people use to make their choices and "includes not only the right to vote for a Congressman or a mayor in a general, special, or a primary election, but also the right to nominate by petition or convention or the right to participate in procedures such as initiative or recall where they have been adopted"); 7537 (Rep. Howard) (stated objective is allowing 20-, 19-, and 18-year-olds to vote in all elections); 7540 (Rep. Wiggins); 7552 (Rep.

Anderson) (stating that *Oregon* was not meant to block the "general principle of lowering the voting age to 18.").

Thus, the legislative history supports nothing more than the simple proposition that the Twenty-Sixth Amendment extended the right to cast a ballot to 18-year-olds. It in no way restricted the states' ability and obligation to regulate the manner of voting, including establishing an age-based privilege for casting an absentee ballot.

iv. *Judicial decisions rendered contemporaneous with adoption of the Twenty-Sixth Amendment demonstrate that the amendment does not extend to elevate absentee voting to a constitutional right.*

The judicial framework existing when the Twenty-Sixth Amendment was adopted demonstrates that the amendment was neither intended nor understood to encompass absentee voting. *See Goodyear Atomic Corp. v. Miller,* 486 U.S. 174, 184–85 (1988) (holding that federal courts "presume that Congress is knowledgeable about existing law pertinent to the legislation it enacts"); *see also Strawn v. AT&T Mobility, LLC,* 530 F.3d 293, 297 (4th Cir. 2008). That framework includes not only *Oregon*, *supra*, but also—as the district court recognized—the Supreme Court's decision in *McDonald v. Board of Election Commissioners of*

*Chicago*. In *McDonald,* a case involving an Equal Protection challenge to an Illinois absentee voting statute, the Supreme Court held as follows:

> [T]here is *nothing in the record to indicate that the Illinois Statutory scheme has an impact on appellants' ability to exercise the fundamental right to vote. It is thus not the right to vote that is at stake here but a claimed right to receive absentee ballots*. Despite appellants' claim to the contrary, *the absentee statutes*, which are designed to make voting more available to some groups who cannot easily get to the polls, *do not themselves deny appellants, the exercise of the franchise* . . . ."

394 U.S. at 807-08 (emphasis added). *McDonald*'s distinction between the "right to vote" and the "claimed right to receive absentee ballots," which has stood for more than a half century, is fatal to Appellants' claims.

Demonstrating that *McDonald* was a backdrop to what the Twenty-Sixth Amendment was intended and understood to accomplish, other federal courts of appeals have applied that decision in holding that the "right to vote" is the right to exercise the franchise and not the manner by which that franchise is exercised. *See, e.g.*, *Mays v. LaRose*, 951 F.3d 775, 783 (6th Cir. 2020) (rejecting a challenge to a state law setting parameters on the time to request absentee ballots prior to an election given that those parameters regulated the *manner* of voting); *see also Richardson v. Texas Sec'y of State*, 978 F.3d 220, 232-33 (5th Cir.

2020) (upholding a state law requiring signature verification procedures); *Common Cause Indiana v. Lawson*, 977 F.3d 663, 664 (7th Cir. 2020) ("As long as it is possible to vote in person, the rules for absentee ballots are constitutionally valid if they are supported by a rational basis and do not discriminate based on a forbidden characteristic such as race or sex."); *Veasey v. Abbott*, 830 F.3d 216, 307 (5th Cir. 2016) (Jones, J., concurring) ("No court has ever held that a voter has a right to cast a ballot by the method of his choice.") (footnote omitted); *Griffin v. Roupas*, 385 F.3d 1128, 1130–32 (7th Cir. 2004) (rejecting a challenge to a state law excluding the plaintiffs from absentee voting).

Moreover, after *McDonald,* the Supreme Court considered several Equal Protection challenges to state absentee voting laws—each of which recognized *McDonald's* distinction between the right to exercise the vote versus the "claimed right to vote" absentee. In *Kramer v. Union Free School District No. 15*, the Court noted:

> This case presents an issue different from the one we faced in *McDonald* [ ]. The present appeal involves *an absolute denial of the franchise*. In *McDonald*, on the other hand, we were reviewing a statute which made *casting a ballot easier for some who were unable to come to the polls*. As we noted, there was no evidence that the statute absolutely prohibited anyone from exercising the franchise; at issue was not a claimed right to vote but a claimed right to an absentee ballot.

395 U.S. 621, 626 n.6 (1969) (cleaned up) (emphasis added).

v. *Decisions of federal courts of appeals that have considered claims like those made by Appellants have also concluded that the Twenty-Sixth Amendment does not extend to eliminate age-based distinctions in the manner of voting.*

The United States Courts of Appeals for the Fifth and Seventh Circuits have addressed the application of the Twenty-Sixth and Fourteenth Amendments *vis a vis* state absentee laws allowing voters aged 65 and over to vote by mail without excuse and not extending that same privilege to voters under 65. Both courts held the state election regulation laws were constitutional. *See Ciscino v. Nelson*, 2023 WL 5769414 (5th Cir. 2023) (per curiam), *cert. denied*, 144 S. Ct. 1391; *Abbott*, 961 F.3d at 402-09 (staying preliminary injunction pending appeal); *Tully,* 78 F.4th at 383.

There are other cases in this circuit that have dealt with the Twenty-Sixth Amendment regarding prerequisites to voting such as residency, *see Dyer v. Huff,* 382 F. Supp. 1313 (D.S.C. 1973), and voter ID, *Lee v. Virginia St. Bd. of Educ.,* 843 F.3d 592, 607 (4th Cir. 2016); neither court concluded that the Twenty-Sixth Amendment operated to eliminate all age-based distinctions in voting. In *Walgren v. Board of Selectmen of Town of Amherst*, 519 F.2d 1364 (1st Cir. 1975), there was

a Twenty-Sixth Amendment challenge to Amherst's holding municipal primary elections while the college students were on recess, burdening them either to come back, not leave campus or vote absentee. Noting there is no clear test for application of the Twenty-Sixth Amendment, the court held that the voting date was constitutional.

While not dealing with voting laws, the court in *U.S. v. Olson*, 473 F.2d 686 (8th Cir. 1973), opined on the *per se* effect of the Twenty-Sixth Amendment minimum voting age on jury service and systematic exclusion of an "identifiable [age] group." Minnesota's requirement that one had to be 21 to serve on a jury was challenged. Appellant's sole contention was that the ratification of the Twenty-Sixth Amendment rendered Minnesota's requirement *ispo facto* unconstitutional and compared the Twenty-Sixth Amendment to the Fifteenth and Nineteenth Amendments in application. *Olson*, 473 F.2d at 687. The Eighth Circuit held that ratification of the Twenty-Sixth Amendment did not *per se* erect the minimum age for service of a jury. *Id.* at 688-89. For the same reasons, the Twenty-Sixth Amendment does not *per se* erect a minimum age for absentee voting.

Moreover, although not binding on this Court, *Texas Democratic Party v. Abbott,* 961 F.3d 389 (5th Cir. 2020) (*TDP I*), *Texas Democratic Party v. Abbott*, 978 F.3d 168 (5th Cir. 2020) (*TDP II*) (collectively *TDP)*, *Tully v. Okeson*, 977 F.3d 608 (7th Cir. 2020) (*Tully I*), and *Tully v. Okeson*, 78 F.4th 377 (7th Cir. 2023) (*Tully II*) (collectively *Tully*), are persuasive authority for the Court to reject Appellants' position and affirm the constitutionality of § 7-15-320(B)(2). The *TDP* and *Tully* cases involve age-based distinctions in state statutes similar to South Carolina's allowing persons aged 65 or to vote absentee but not extending that right to those under 65. The courts in those cases heavily relied on *McDonald* to reject the claim that age-based absentee voting violates the Twenty-Sixth Amendment. None held age to be a suspect class in the voting context or applied strict scrutiny.

### B. ***Enactment of the Twenty-Sixth Amendment does not require this Court to apply strict scrutiny in evaluating Appellants' claims.***

Appellants argue that after ratification of the Twenty-Sixth Amendment, any age-based regulation of the right to vote is subject to strict scrutiny. Appellants' Br. at 31. Appellants' entire argument is based on their contention that absentee voting is subsumed within the

right to vote. It is not. Thus, there is no abridgment of the right to vote and the State is exercising its authority and obligation pursuant to regulate the manner of voting.

But even assuming that absentee voting is encompassed within the right to vote, § 7-15-320(B)(2) still does not violate the Twenty-Sixth Amendment. For the first time,[8] while admitting that age classifications are not inherently suspect, Appellants contend on appeal that age is a suspect class subject to strict scrutiny with regard to voting. Appellants' Br. at 31. But *McDonald* requires rejecting Appellants' argument because it applied the "rational relationship" test in evaluating the absentee voting ballot question there. *See* discussion *supra* at 29-32. Once again, *McDonald's* distinction between the "right to vote" and the "claimed right to receive absentee ballots," which has stood for more than a half century, is fatal to Appellants' claims. *See also Gregory v. Ashcroft,* 501 U.S. 452, 470 (1991) ("This Court has said repeatedly that age is not a suspect classification under the Equal Protection Clause.") (internal citations omitted).

---

8 JA104 n.13.

To support their newfound position, Appellants cite to a controversial and rarely relied on footnote in *United States v. Carolene Products*, 304 U.S. 144, 152-53 n.4 (1938) (plurality opinion).[9] For several reasons, Appellants' reliance is misplaced. First, that footnote only garnered the support of a plurality of the Court. Second, as Justice Frankfurter later noted, "A footnote hardly seems to be an appropriate way of announcing a new constitutional doctrine, and the *Carolene* footnote did not purport to announce any new doctrine . . . ." *Kovacs v. Cooper*, 336 U.S. 77, 90–91, (1949) (Frankfurter, J., concurring). Third, as generally noted by Justice Frankfurter in 1949, the footnote was not oft cited even then, *id.* (Frankfurter, J., concurring), and it certainly has not been cited much since. Fourth, as Justice Frankfurter effectively noted, the footnote was, at most, hortatory and the Court later went in a different direction. *See* Lusky, *supra*, at 1098 (reflecting that the footnote was put forth "not as a settled theorem of government or Court-approved

[9] The *Carolene Products*' Footnote 4 was the progenitor of the so called "Preferred Position" doctrine that certain constitutional rights such as freedom of speech, press, and religion are more important than other rights, such as economic ones. The Court moved in a different direction in its subsequent jurisprudence Louis Lusky, *Footnote Redux: A* Carolene Products *Reminiscence*, 82 Colum. L. Rev. 1093, 1101-03 (1982).

standard of judicial review, but as a starting point for debate—in the spirit of inquiry, the spirit of the Enlightenment" and that it "'did not purport to decide anything; it merely made some suggestions for future consideration.'"). And, fifth, the footnote only addressed the Bill of Rights, not later amendments to the Constitution. *See Carolene Prods.*, 304 U.S. at 152-53 n.4 (plurality opinion).

There are other reasons to reject Appellants' *Carolene Products* argument. Following ratification of the Twenty-Sixth Amendment, the Supreme Court has consistently opined that age is not a suspect class. In *Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307 (1976), involving a challenge to a state statute requiring police officers to retire at age 50, the Supreme Court held that age is not a suspect class for Fourteenth Amendment review. In pertinent part, the *Murgia* Court held that "even old age does not define a 'discrete and insular' group, [*Carolene Prods*, 304 U.S. at 152-153, n.4] in need of 'extraordinary protection from the majoritarian political process.' Instead, it marks a stage that each of us will reach if we live out our normal span." *Murgia*, 427 U.S. at 313-314. *Murgia* relied in part on the definition in *San Antonio Independent School Dist. v. Rodrigues*, 411 U.S. 1, 28 (1973), where the Court reasoned

that the traditional indicia of persons included in a "suspect class" are those "saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process." These cases were decided within five years after ratification of the Twenty-Sixth Amendment. Surely, the Supreme Court would have recognized age as a suspect class in the voting context if it thought it so.

In short, *Carolene Products* does not assist Appellants because *Murgia* distinguished an age classification from the "discrete and insular" group referenced in that footnote. Moreover, the definition of a "suspect class" used in *Rodrigues* and relied on in *Murgia* belies Appellants' effort to make age a suspect class for voting purposes. Taken together, all of these authorities demonstrate that Footnote 4 of *Carolene Products* did not consider age a suspect class for voting purposes.

Appellants also rely on *Harper v. Virginia State Board of Elections,* 383 U.S. 663, 670 (1966), and *Rodrigues,* 411 U.S. at 33, for the proposition that the "right to vote free from age-based discrimination is, after ratification of the Twenty-Sixth Amendment, an explicit

constitutional right" subject to strict scrutiny. Appellants' Br. at 31. However, although the right to vote at the age of 18 is fundamentally significant under the Constitution, "[i]t does not follow . . . that the *right to vote in any manner* and the right to associate for political purposes through the ballot *are absolute*." *Burdick*, 504 U.S. at 433 (internal citation omitted) (emphasis added). As discussed below, assuming that age is subject to greater scrutiny that rational basis for purposes of the Twenty-Sixth Amendment, the appropriate level would be the *Anderson/Burdick* balancing test.

In *Crawford*, 553 U.S. at 189-91 (plurality opinion), the Supreme Court discussed its evolution from the strict scrutiny standard applied to the right to vote enunciated in *Harper* to the currently required constitutional analysis. In 1966 in *Harper*, even rational restrictions were "invidious" if unrelated to voter qualification. *Id.* at 189 (plurality opinion). However, in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), the Court rejected this analysis and instead "confirmed the general rule that 'evenhanded restrictions that protect the integrity and reliability of the electoral process itself' and not invidious and satisfy the standard set forth in *Harper.*" *Crawford*, 553 U.S. at 189-190 (plurality opinion). The

*Crawford* plurality then explained that, "[h]owever slight [a] burden may appear [on a discrete class of voters] it must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Id.* at 191 (plurality opinion) (quoting *Norman v. Reed,* 502 U.S. 279, 288-89 (1992)). South Carolina's interest in orderly elections, preventing fraud, preserving the integrity of elections, and enhancing voter confidence in those elections is sufficiently weighty to justify the *de minimis* inconvenience voters may experience from § 7-15-320(B)(2). *See id.; see also Brnovich v. Democratic Nat'l Comm.,* 594 U.S. 647, 672, 685-86 (2021) (recognizing that "[f]raud is a real risk that accompanies mail-in voting even if Arizona had the good fortune to avoid it")

While the State's interest supporting § 7-15-320(B)(2) is weighty, Appellants' alleged "burden" is nothing more than a minor inconvenience at most. The statute only enables absentee voting by elderly voters whose ability to vote might be extinguished or impacted due to conditions of aging. Appellants cite to nothing that demonstrates § 7-15-320(B)(2) has any burdensome impact on their right to vote.

### C. *The Twenty-Sixth Amendment should not be read in accord with the jurisprudence of the Fifteenth, Nineteenth, and Twenty-Fourth Amendments.*

Appellants rely on a number of cases applying the Fifteenth, Nineteenth, and Twenty-Fourth Amendments. However, aside from the fact that they do not address the Twenty-Sixth Amendment, those cases also post-date the legislative debate about and adoption of the Twenty-Sixth Amendment. Congress could not have intended to rely on the unknown. Moreover, those cases involve the Voting Rights Act, which represents Congress' determination about appropriate legislation to enforce the guarantees of the Fourteenth Amendment:

> Congress' § 5 power is not confined to the enactment of legislation that merely parrots the precise wording of the Fourteenth Amendment. Rather, Congress' power 'to enforce' the Amendment includes the authority both to remedy and to deter violation of rights guaranteed thereunder by prohibiting *a somewhat broader swath of conduct, including that which is not itself forbidden by the Amendment's text.*

*Kimel v. Florida Bd. of Regents,* 528 U.S. 62, 81 (2000) (emphasis added). The Twenty-Sixth Amendment contains an identically worded enforcement provision—"The Congress shall have power to enforce this article by appropriate legislation"—but Congress has not enacted any

legislation to prohibit age-based qualifications for absentee voting. As such, the Voting Rights Act cases cited by Appellants are inapposite.

Appellants cite to certain Senate and House Reports for the proposition that the Twenty-Sixth Amendment should "be construed as comparable in scope to the Fifteenth Amendment and the Nineteenth Amendment which proscribed racial discrimination and sex discrimination, respectively, in the exercise of the franchise." Appellants' Br. at 3. Appellants are attempting to impute to the jurisprudence applicable to classifications of voters subject to historically purposeful unequal treatment to a voter classification—21 years old being the presumptive age under U.S. Const. amend. XIV, § 2—to a classification of voters not historically subject to purposeful unequal treatment. There is no credible support for Appellants' position because age—neither before nor after the Twenty-Sixth Amendment—has not, unlike race and sex, historically been subject to disparate treatment. Rather, age based distinctions have been respected and recognized as a rational classification for legislative purposes. *Cf. Kimel*, 528 U.S. at 83 ("Older persons, again, unlike those who suffer discrimination on the basis of

race or gender, have not been subjected to a 'history of purposeful unequal treatment.'") (citations omitted).

Appellants also misconstrue the prohibitions of the Fifteenth, Nineteenth, and Twenty-Fourth Amendments by contending that they "incorporate[] precisely their principles of 'no discrimination' in any aspect of casting a ballot and vigorous enforcement against any difference in treatment." This is simply *not* an accurate summation of the jurisprudence construing these amendments. These amendments address a qualification as a condition precedent to exercising the franchise, not the manner in which the franchise is exercised.

However, even assuming without conceding that Appellants are correct in their argument that the Fifteenth Amendment jurisprudence applies to the Twenty-Sixth Amendment, they would have to prove that the State intended to discriminate on the basis of age in enacting the § 7-15-320(B)(2). *See Lee,* 843 F.3d at 607. The plaintiffs in *Lee* challenged Virginia's voter ID law on numerous grounds, including the Fifteenth and Twenty-Sixth Amendments. In disposing of the Fifteenth Amendment claim, this Court applied the *Arlington Heights* test to determine whether

race was a motivating factor. *Id.* at 604 (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977)).

Significant to this case and Appellants' Twenty-Sixth Amendment claim, the *Lee* plaintiffs claimed—like Appellants here—that because of the parallel language used in both the Fifteenth and Twenty-Sixth Amendments—*i.e.*, "the right of citizens of the United States . . . to vote shall not be denied or abridged"—Fifteenth Amendment jurisprudence should be used to analyze a Twenty-Sixth Amendment claim. *Id.* at 607. However, after noting that it was far from clear that Fifteenth Amendment jurisprudence was applicable to a Twenty-Sixth Amendment claim, this Court found no evidence of discrimination in the record and held that "if the Twenty-Sixth Amendment functions like the Fifteenth Amendment, the plaintiffs would also need to demonstrate an intent to discriminate on the basis of ages." *Id.*

Appellants have neither alleged nor presented the Court with any proof of an intent to discriminate against persons under the age of 65. Rather, the State rationally established 65 as the age cutoff in § 7-15-320(B)(2) in recognition of the fact that the ability of persons of this age and older to travel to the polls might be extinguished or

restricted because of intervening circumstances such as physical impediments. Appellants have adduced no evidence demonstrating that this distinction was born of discriminatory intent. Their sole challenge in this regard is that they want to vote absentee for convenience but cannot because they are not 65. That is not enough.

### D. *Summary of the Twenty-Sixth Amendment argument.*

The Twenty-Sixth Amendment lowered the voting age in all elections in the United States. Because the right to vote includes the exercise of the franchise, not the privilege of voting absentee, § 7-15-320(B)(2) neither denies nor abridges Appellants' right to vote. Consequently, pursuant to the Elections Clause, states retain the right to regulate the manner of voting, such as by absentee ballot. Moreover, the Twenty-Sixth Amendment does not make age a suspect class for voting purposes and the jurisprudence interpreting the Fifteenth, Nineteenth, and Twenty-Fourth Amendments is not applicable to the Twenty-Sixth Amendment. The rejection of Appellants' Twenty-Sixth Amendment claims by the district court should be affirmed.

### 2. Section 7-15-320(B)(2) does not violate the Equal Protection Clause of the Fourteenth Amendment.

The district court correctly determined that the rational relationship test is the appropriate level of scrutiny in this matter because § 7-15-320(B)(2) does not impact either the fundamental right to vote or a suspect class. (JA111). "The distinctions drawn by a challenged statute must bear some rational relationship to a legitimate state end" and will be struck down "only if based on reasons totally unrelated to the pursuit of that goal." *McDonald*, 394 U.S. at 809. The Supreme Court has noted that states have considerable leeway under the Equal Protection Clause to enact legislation apparently affecting similarly situated people differently and the "distinctions need only be drawn in such a manner as to bear some rational relationship to a legitimate state end." *Clements v. Fashing*, 457 U.S. 957, 963 (1982) (plurality opinion); *see also Tully*, 977 F.3d at 615 ("[B]ecause Indiana's absentee-voting scheme does not impact [the] fundamental right to vote, *McDonald* commands that rational-basis review applies.")

The district court correctly recognized that precedent does not support Appellants' claims. Access to absentee voting is not a fundamental right and adoption of the Twenty-Sixth Amendment did not

change that conclusion. Absentee voting is a privilege enacted as part of the manner of voting, and one that the State has a legitimate concern in regulating. Although it is most difficult to commit voter fraud casting a vote in person, absentee voting is the manner of voting that lends itself most readily to fraud, be it in the acquisition, distribution, harvesting or returning of the ballots.[10] *See Brnovich*, 594 U.S. 685-86; s*ee also Greidinger v. Davis,* 988 F.2d 1344, 1354 (1993). Accordingly, while recognizing and accommodating challenges that may be faced by voters aged 65 and older, the State rationally chose that age as a basis for limiting the no-excuse absentee voting.[11]

---

10 In *Crawford*, 553 U.S. at 196 (plurality opinion), based on flagrant examples of fraud in the Nation's history, the Supreme Court held that prevention of fraud is a legitimate state interest even though there may be no evidence of fraud in a record.

11 There are numerous state and federal statutes (mandatory retirement, Medicare, Social Security, to name a few) that are age-related. Originally, South Carolina set the floor for absentee voting at age 72, but later lowered it to 65. This is almost uniformly recognized at the "retirement" age, including for federal programs, including generally Social Security and Medicare. South Carolina has a legitimate, non-discriminatory basis for limiting absentee voting without excuse to only persons aged 65 and older, who otherwise are more prone to have difficulties voting in person.

But even assuming this Court were to analyze Appellants' Equal Protection challenges under the *Anderson/Burdick* framework, § 7-15-320(B)(2) nevertheless is constitutional. *Anderson* involved a challenge under the First and Fourteenth Amendments to Ohio's filing regulations for independent candidates for President. The Court concluded that constitutional challenges to specific state election laws are not subject to a litmus-paper test and applied a balancing test to see if the burden placed on Ohio voters' freedom to choose candidates was outweighed by that state's interest in setting a different filing deadline for small party candidates. 460 U.S. at 789. The Court held that while voter's rights are fundamental, "not all restrictions imposed by the States on candidates' eligibility for the ballot impose constitutionally-suspect burdens on a voters' rights to associate or to choose among candidates." *Id*. at 788. Rather, a more flexible standard applies. *Id*. at 788-789. The Court also recognized that, "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Id*. at 788 (cleaned up).

The Court later clarified *Anderson* when it addressed First and Fourteenth Amendments challenges to Hawaii's election scheme prohibiting write-in voting. *See Burdick*, 504 U.S. at 433-34. Recognizing that the right to vote is fundamentally significant under the Constitution, the Court determined that "[i]t does not follow, however, that the *right to vote in any manner* and the right to associate for political purposes through the ballot *are absolute*." *Id.* at 433 (internal citation omitted) (emphasis added). The Court held that, to have fair, honest and non-chaotic elections, the voting process must have substantial regulation. *Id.* The mere fact that a state's system creates barriers does not itself require the imposition of strict scrutiny. *Id.* at 433-34 (internal citations omitted); *see also Clingman v. Beaver*, 544 U.S. 581, 593 (2005) ("To deem ordinary and widespread burdens like these severe would subject virtually every electoral regulation to strict scrutiny, hamper the ability of States to run efficient and equitable elections, and compel federal courts to rewrite state electoral codes."). When an election law "imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify the restrictions.'"

*Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 788); *see also Clingman*, 544 U.S. at 593 ("It is beyond question that States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder.") (cleaned up); *Nelson v. Warner*, 12 F.4th 376, 389-390 (4th Cir. 2021).

Applying *Anderson/Burdick* and its progeny leads to the conclusion that § 7-15-320(B)(2) is constitutional. A state's election regulatory scheme violates the constitution only when it imposes an unreasonable burden on a voter's rights otherwise protected by the Fourteenth or Twenty-Sixth Amendments. *Libertarian Party of Va. v. Alcorn,* 826 F.3d 708, 716-17 (4th Cir. 2016) (holding that the character and magnitude of the claimed injury is measured against the State's important regulatory interest and even "modest" burdens on the voter are usually justified by the State's regulatory interest). Therefore, to prevail Appellants must establish some unreasonable burden on their right to vote.

Appellants have not identified any burden § 7-15-320(B)(2) imposes on them. They have merely identified an inconvenience by being unable to vote in the manner they allege is "most particularly convenient." (JA24 ¶ 6(a)). But when an election law "imposes only reasonable,

nondiscriminatory restrictions upon the First and Fourteenth Amendment rights of voters, the State's important regulatory interest are generally sufficient to justify' the restrictions." *Burdick*, 504 U.S. at 434 (cleaned up). The requirement regulating the right to vote must impose a material effect on those subject to the regulation. *See Harman v. Forssenius,* 380 U.S. 528, 541 (1965).

Appellants' attempt to argue that the district court misunderstood word "material" in *Harman* is misplaced and erroneous. As used in the opinion, "material" means "significant" or "unduly burdensome." The *Harman* Court held as follows:

> [I]n order to demonstrate the invalidity of s 24–17.2 of the Virginia Code, it need only be shown that it imposes a *material requirement* solely upon those who refuse to surrender their constitutional right to vote in federal elections without paying a poll tax. Section 24–17.2 unquestionably erects a *real obstacle* to voting

*Id.* (emphasis added). Including Appellants' cite to page 542, "material" or "materially" is used seven other times in *Harman*, at pages 534, 535, 536, 543 & n.9. Read in context, "material" can only mean "significant" or "unduly burdensome."

The legitimate State interest behind § 7-15-320(B)(2) to limit absentee voting to persons aged 65 and older is driven by the General

Assembly's desire to have elections that the citizens have confidence in—those that are orderly and without fraud, where citizens can trust the outcome of elections. As the Supreme Court recently opined in *Brnovich*:

> One strong and entirely legitimate state interest is the prevention of fraud. Fraud can affect the outcome of a close election, and fraudulent votes dilute the right of citizens to cast ballots that carry appropriate weight. Fraud can also undermine public confidence in the fairness of elections and the perceived legitimacy of the announced outcome.

594 U.S. at 672.[12] So it is here.

In sum, applying the proper analytical framework requires rejecting Appellants' claims. Any perceived "burden" imposed on Appellants, simply because they do not have the option to vote Absentee without excuse, given the times, places and manners they can vote in South Carolina is not material, but *de minimis*, especially when balanced against the State's legitimate interests in having orderly and fair

---

[12] Preventing voter fraud and insuring the integrity of elections and the State's confidence in the election system is still a paramount concern of the General Assembly and was at the time immediately preceding the amendment to § 7-15-320(B)(2) in 2022. *See Middleton v Andino*, 990 F.3d 768 (4th Cir. 2020). While South Carolina has not had significant numbers of cases of fraudulent voting, there have been some. *See U.S. v. Carmichael*, 685 F.2d 901 (4th Cir. 1982); South Carolina EXECUTIVE ORDER NO. 2007-07, https://www.scstatehouse.gov/Archives/ExecutiveOrders/exor0707.htm.

elections in which its citizens have confidence. *See Purcell*, 549 U.S. at 3 ("Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy."). This Court should affirm the determination by the district court that § 7-15-320(B)(2) is constitutional whether the statute is reviewed using the rational relationship test or the *Anderson/Burdick* test.

## Conclusion

For the reasons set forth above, the Order and Judgment of the district court should be affirmed.

## Request for Oral Argument

Pursuant to Local Rule 34(a), Appellees respectfully request oral argument. This appeal presents a number of interrelated issues and several novel questions of law. Appellees believe that oral argument will greatly assist the Court in distilling the relevant legal and factual issues and therefore substantially aid the decisional process.

[*Signature Page Follows*]

Respectfully submitted,

*s/Tracey C. Green*
Mary Elizabeth Crum
Tracey C. Green
Michael R. Burchstead
BURR & FORMAN LLP
PO Box 11390
Columbia, SC 29211
(803) 799-9800
lcrum@burr.com
tgreen@burr.com
mburchstead@burr.com

Thomas W. Nicholson
STATE ELECTION COMMISSION
1122 Lady Street, Suite 500
Columbia, SC 29201
(803) 734-9063
tnicholson@elections.sc.gov

*Counsel for the State Election Commission and its Named Members*

September 4, 2025

*s/John E. Robinson*
THE LAW OFFICES OF JOHN E. ROBINSON
36 Broad Street
Charleston, SC 29401
(843) 723-5152
john@charlestonlawoffices.com

*Counsel for Charleston County Board of Voter Registration and Elections*

September 4, 2025

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**No.** 25-1413 **Caption:** Trudy Grant v. Howard Knapp

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

**Type-Volume Limit for Briefs if Produced Using a Computer:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2) & 40(d)(3).

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6). Sans-serif type, such as Arial, may not be used except in captions and headings.

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

☑ this brief or other document contains 10,521 [*state number of*] words

☐ this brief uses monospaced type and contains ____________ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

☑ this brief or other document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 [*identify word processing program*] in 14-point Century Schoolbook [*identify font, size, and type style*];

**or**

☐ this brief or other document has been prepared in a monospaced typeface using ____________________ [*identify word processing program*] in ____________________ [*identify font, size, and type style*].

**NOTE: The Court's preferred typefaces are Times New Roman, Century Schoolbook, and Georgia. The Court discourages the use of Garamond.**

(s) Tracey C. Green

Party Name Defendants-Appellees Date: September 4, 2025

12/09/2024 NA/MEO