**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 25-1413**

---

TRUDY B. GRANT; SARAH KRAWCHECK; NASHONDA HUNTER; MAX MILLIKEN; CALEB CLARK,

Plaintiffs – Appellants,

and

JORDAN MAPP,

Plaintiff,

v.

CONWAY BELANGIA, as the Executive Director of the South Carolina Election Commission; JOANNE DAY, as a Member of the South Carolina Election Commission; CLIFFORD J. EDLER, as a Member of the South Carolina Election Commission; ANGELA STRINGER, as a Member of the South Carolina Election Commission; SCOTT MOSELEY, as a Member of the South Carolina Election Commission; CHARLESTON COUNTY BOARD OF ELECTIONS AND VOTER REGISTRATION; ROBERT BOLCHOZ, Chairman of the South Carolina State Election Commission,

Defendants – Appellees.

------------------------------

CONSTITUTIONAL ACCOUNTABILITY CENTER,

Amicus Supporting Appellant.

---

Appeal from the United States District Court for the District of South Carolina, at Charleston. Bruce H. Hendricks, District Judge. (2:23-cv-06838-BHH)

---

Argued: January 28, 2026 Decided: August 18, 2026

---

Before GREGORY, HARRIS, and RICHARDSON, Circuit Judges.

Reversed in part, affirmed in part, and remanded by published opinion. Judge Gregory wrote the opinion, in which Judge Harris and Judge Richardson joined.

**ARGUED:** Pamela Karlan, STANFORD UNIVERSITY SCHOOL OF LAW, Stanford, California, for Appellants. Tracey Colton Green, BURR & FORMAN LLP, Columbia, South Carolina, for Appellee. **ON BRIEF:** Armand Derfner, Jonathan S. Altman, DERFNER & ALTMAN, LLC, Charleston, South Carolina; Susan K. Dunn, Charleston, South Carolina; Chad W. Dunn, BRAZIL & DUNN, LLP, Austin, Texas, for Appellants. Mary Elizabeth Crum, Michael R. Burchstead, BURR & FORMAN LLP, Columbia, South Carolina; Thomas W. Nicholson, STATE ELECTION COMMISSION, Columbia, South Carolina, for Appellees State Election Commission and its Named Members. John E. Robinson, THE LAW OFFICES OF JOHN E. ROBINSON, Charleston, South Carolina, for Appellee Charleston County Board of Elections and Voter Registration. Elizabeth B. Wydra, Brianne J. Gorod, David H. Gans, Anna K. Jessurun, CONSTITUTIONAL ACCOUNTABILITY CENTER, Washington, D.C., for Amicus Curiae.

GREGORY, Circuit Judge:

The Constitution grants states broad authority to regulate "[t]he Times, Places and Manner of holding Elections," U.S. Const. art. 1, § 4, including whether to permit absentee voting. But when a state offers a method for casting a ballot, the Constitution forbids restricting access to that voting method based on any prohibited ground, including age. U.S. Const. amend. XXVI. Because the South Carolina statute at issue restricts access to "no excuse" absentee-by-mail ballots to voters sixty-five years of age or older, we agree with Plaintiffs that it violates the Twenty-Sixth Amendment. We affirm, however, the district court's dismissal on Plaintiffs' Equal Protection claim.

I.

A.

Section 7-15-320 of the South Carolina Code states that "[q]ualified electors" in the following four categories "must be permitted to vote by absentee ballot in an election": electors who are physically disabled; members of the Armed Forces and Merchant Marines of the United States, their spouses, and dependents; persons admitted to hospitals as emergency patients on the day of an election or within a four-day period before the election; and "persons sixty-five years of age or older." S.C. Code § 7-15-320(B). Voters under age sixty-five who do not fall into any of these categories may vote absentee-by-mail only if they meet one or more of the following four conditions: they have conflicting employment obligations and can present written certification of the obligations to their county board of voter registration and elections; they will be attending to sick or physically disabled persons;

they are confined to a jail or pretrial facility pending disposition of arrest or trial; or they are otherwise going to be absent from their county of residence. S.C. Code § 7-15-320(A).

So, as it relates to age, this statutory framework creates a two-tier absentee-by-mail voting system: voters age sixty-five and older may vote absentee by mail in any election for any reason, while voters under age sixty-five may vote absentee by mail only if they qualify under one of the four narrow enumerated excuses in § 7-15-320(A) or other specified categories in § 7-15-320(B).

Under South Carolina's election code, absentee voting by mail operates through a structured application process with timing and documentation features. Voters (or certain permitted intermediaries) must first request an absentee ballot application from the county board in person, by telephone, or by mail. S.C. Code Ann. § 7-15-330(A). They must then return their completed application to their county board of voter registration and elections in person by 5:00 p.m. on the eleventh day before the election. S.C. Code Ann. § 7-15-330(C).[1] For those seeking absentee voting based on work obligations, the statute requires a voter's application to include written certification from their employer. S.C. Code Ann. § 7-15-320(A)(1). The county board must maintain a serially numbered application record book and, with limited exceptions, that information becomes public shortly before the election. S.C. Code Ann. § 7-15-330(E).

[1] The scheme contains a narrow accommodation for voters admitted to a hospital within four days of the election or on Election Day. S.C. Code Ann. § 7-15-330(D).

B.

Plaintiffs are five registered South Carolina voters under age sixty-five who challenge the age-based restrictions on absentee-by-mail voting imposed by § 7-15-320 of the South Carolina Code. These voting rules, they argue, unconstitutionally discriminate against them solely based on their age, in violation of both the Twenty-Sixth Amendment and the Equal Protection Clause of the Fourteenth Amendment. To bring this challenge, Plaintiffs sued the Executive Director and all the members of South Carolina's State Election Commission in their official capacities, seeking declaratory and injunctive relief. The district court granted summary judgment to Defendants on both claims. Plaintiffs timely appealed.

II.

Before turning to the merits, we must address Article III standing.[2] Article III of the Constitution limits the federal judicial power to "Cases" and "Controversies," and standing is an essential part of that limitation. U.S. Const. art. III, § 2, cl. 1. It is well-established that a plaintiff must satisfy three elements to show standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). First, the plaintiff must show an injury in fact, meaning a concrete and particularized injury that is actual or imminent, not conjectural or hypothetical. *Id.* at 560; *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339–41 (2016). Second, plaintiff's alleged injury must be fairly traceable to the challenged conduct and not the result of independent action by a

[2] In their response brief on appeal, Defendants argued only that they were entitled to summary judgment on the merits. Resp. Br. 7–10. They did not challenge Plaintiffs' standing. The district court briefly addressed standing and found it satisfied. J.A. 103. We ordered supplemental briefing on standing before oral argument, and the issue was addressed extensively during the hearing.

third party not before the court. *Lujan*, 504 U.S. at 560–61. Third, it must be likely, not merely speculative, that the requested relief will remedy the alleged injury. *Id.* at 561; *Allen v. Wright*, 468 U.S. 737, 751 (1984); *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). The plaintiff must establish each of these elements "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. We review de novo whether Plaintiffs have Article III standing. *See Deal v. Mercer County Bd. of Educ.*, 911 F.3d 183, 188 (4th Cir. 2018).

Defendants here attack Plaintiffs' Article III standing almost exclusively on the first requirement, asserting that Plaintiffs have not suffered a cognizable injury in fact and thus do not have standing to sue. We disagree. The alleged injury in this case is the unequal treatment in voting based on age. This injury is sufficient to confer standing on Plaintiffs in this case.

A.

We first address whether Plaintiffs have shown an injury in fact and conclude that they have. When, as here, an individual challenges a discriminatory barrier to accessing a government program, the Supreme Court has made clear that the central question is whether the person is "able and ready" to take part in the program. As we explain below, Plaintiffs here make that showing.

To begin, we must carefully identify the relevant Article III injury. The injury here is not Plaintiffs' inability to vote absentee by mail *per se*. Instead, when a plaintiff challenges a discriminatory barrier to accessing a government program, the injury is "the denial of equal treatment resulting from the imposition of the" state's age-based eligibility rule. *Ne. Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville*,

508 U.S. 656, 666 (1993). So, in this case, the relevant injury is the unequal treatment with respect to voting—Plaintiffs have fewer means to cast a vote than similarly situated voters age sixty-five or older. The Supreme Court has made clear that this sort of denial of equal treatment within a government program is a cognizable injury.

Identifying a cognizable injury does not end our inquiry. We must still ensure that Plaintiffs have met the imminence and particularization requirements of standing. To aid this inquiry, we consider several cases in which the Supreme Court addressed how to analyze standing when a plaintiff seeks an injunction to prevent his unequal treatment within a government program. In those cases, the Court made clear that a plaintiff has standing only if he is "able and ready" to participate in the government program. *See Carney v. Adams*, 592 U.S. 53, 63 (2020).

The Supreme Court first identified the able-and-ready test in *Associated General Contractors*, 508 U.S. at 666. There, a group of contractors brought an equal protection claim against a local ordinance that set aside certain government contracts for minority-owned businesses. The Court explained that the relevant injury in this kind of unequal access case is not "the ultimate inability to obtain the benefit" but the "denial of equal treatment." *Id.* So, the contractors did not need to show they "would have obtained the benefit but for the barrier." *Id.* Instead, they only needed to show that they were "able and ready to bid on contracts and that a discriminatory policy prevent[ed] [them] from doing so on an equal basis." *Id.* The contractors were "able and ready" because they showed that they "regularly bid on construction contracts in Jacksonville, and that they would have bid on contracts set aside pursuant to the city's ordinance were they so able." *Id.* at 668.

The Court again applied the able-and-ready test in *Gratz v. Bollinger*, 539 U.S. 244 (2003). In *Gratz*, a student challenged the University of Michigan's admission policies after being denied admission due to the school's affirmative action policies. On top of seeking damages for his earlier rejection, the student sought forward-looking relief to allow him to transfer into the school. To have standing to seek an injunction, the Court held the student needed to show that he was "'able and ready' to apply as a transfer student should the University cease to use race in undergraduate admissions." *Id.* at 262. The Court emphasized that the student did not need to have a transfer application pending with the university; being able and ready to apply was enough. *Id.* at 260–61.

The Supreme Court further explained how to decide whether somebody is "able and ready" in *Carney v. Adams*, 592 U.S. 53 (2020). The plaintiff in *Carney* challenged a state requirement that applicants for certain judgeships must be members of one of the two major political parties. The plaintiff was an attorney who registered as a political independent shortly before challenging the major-party requirement. The Court reviewed all of the available record evidence to determine whether he was genuinely "able and ready" to apply for a judgeship. *Id.* at 63–64. Despite the plaintiff's claims that he would apply if the major-party requirement was removed, the Court concluded that the record suggested the opposite. Beyond the plaintiff's bare assertion that he would apply, nothing supported his claim. In fact, evidence suggested that the plaintiff had switched his party affiliation for the sole purpose of challenging the state rule. So, the Court held that the plaintiff lacked standing.

Three lessons emerge. First, a plaintiff need not have a pending application to show that he is able and ready to participate in the government program. *Gratz*, 539 U.S. at 260–

61; *Carney*, 592 U.S. at 66. Second, a plaintiff's past conduct, together with genuine future intent, can show that he is able and ready to participate. *Associated Gen. Contractors*, 508 U.S. at 668. Third, a plaintiff's bare assertion of future intent will not suffice if belied by record evidence. *Carney*, 592 U.S. at 63–65. These lessons all support the core goal of the able-and-ready test: ensuring that the plaintiff has shown an individualized, imminent injury. In each of the relevant cases, the Court ensured that it was "reasonably foreseeable" that plaintiff faced future injury. *Id.* at 63.

To apply these lessons, we must understand what the relevant government program is in which the plaintiffs must be able and ready to participate. Recall Plaintiffs' core claim: South Carolina has unlawfully abridged their right to vote. Plaintiffs have fewer voting options than similarly situated voters aged sixty-five or older. For that reason, the relevant "program" is voting as a whole. Plaintiffs will be injured by unequal treatment whenever they vote. So, Plaintiffs must show that they are able and ready to vote in an upcoming election.[3]

Plaintiffs comfortably meet this standard. For starters, there is no doubt that Plaintiffs are "able" to vote. *Cf. Hierholzer v. Guzman*, 125 F.4th 104, 114 (4th Cir. 2025) (holding that the plaintiff was not "able and ready" to participate in a government program where plaintiff did not meet basic qualifications). Record evidence shows that Plaintiffs have regularly voted in past elections. In fact, some Plaintiffs have voted absentee in prior

---

[3] While one could argue that the relevant program is specifically "no excuse" absentee voting, we reject that argument. Plaintiffs assert no right to vote by mail. They assert the right to vote free of an age-based abridgement, and absentee and in-person voting are alternative means to that single end. So we conclude that voting generally is the relevant focus.

elections, including one Plaintiff who voted by mail in North Carolina—which offers absentee-by-mail voting to all voters.[4] And Plaintiffs are "ready" to vote, too. They plan to vote in future elections and desire the option to vote absentee by mail.[5] Unlike in *Carney*, where record evidence undermined the plaintiff's claims, there is no reason to doubt that Plaintiffs' desire here is genuine. Plaintiffs' history of regular voting and intent to do so in the future is enough in this case to show that they are "able and ready" to vote. So, they satisfy the first prong of standing.

B.

Plaintiffs also easily satisfy the causation and redressability requirements of Article III standing. Their alleged injury arises from the age-based barrier to "no excuse" absentee-by-mail voting created by South Carolina's statutory scheme. That unequal access therefore flows directly from the statute's text, so causation is met. *See Lujan*, 504 U.S. at 560–61.

---

[4] While it may be relevant that one Plaintiff voted absentee by mail without excuse in the past, it is by no means required. Of course, those Plaintiffs who have lived their whole lives in South Carolina have never had the opportunity to vote absentee without excuse. So to require a track record of "no excuse" absentee voting would be to raise an insurmountable barrier for Plaintiffs.

[5] Plaintiffs have not identified a specific election in which they would certainly vote absentee by mail. But they need not do so. The contractors in *Associated General Contractors* did not need to identify a specific future contract on which they would bid absent the set-aside policy. 508 U.S. at 668. A plaintiff need only show that it is "reasonably foreseeable" that he would face the discriminatory treatment. *Carney*, 592 U.S. at 63. Plaintiffs have done so here. Moreover, requiring Plaintiffs to identify a specific election would sit uneasily with the realities of election litigation. Courts must consider the potential for interference with elections when asked to alter rules close to Election Day. *See Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006) (per curiam). Requiring an election-specific pledge would tend to force review into the very period when pre-election relief is least feasible.

And given that Plaintiffs seek declaratory and injunctive relief, a ruling for Plaintiffs would require South Carolina either to permit "no excuse" absentee-by-mail ballot access on age-neutral terms or eliminate age-based rules for "no excuse" absentee-by-mail voting altogether. It does not matter, for standing purposes, whether the constitutional defect is cured by extending the challenged voting option to younger voters or by withdrawing it from older voters. *See Heckler*, 465 U.S. at 738–39 ("we have never suggested that the injuries caused by a constitutionally underinclusive scheme can be remedied only by extending the program's benefits to the excluded class"). In discrimination cases, "plaintiffs . . . may seek equal treatment in the form of a level playing field," regardless of whether the government levels up or levels down. *Planned Parenthood of S.C., Inc. v. Rose*, 361 F.3d 786, 790 (4th Cir. 2004); *Heckler*, 465 U.S. at 738–39. Either way, the disparity Plaintiffs challenge would be removed—and thus their injury would be redressed. *See Associated Gen. Contractors*, 508 U.S. at 666 n.5.

We therefore conclude that Plaintiffs have standing and proceed to the merits.

## III.

The district court granted summary judgment to Defendants on both constitutional claims. We review the district court's decision de novo. *See S.C. Green Party v. S.C. State Election Comm'n*, 612 F.3d 752, 755 (4th Cir. 2010).

## IV.

Turning to the merits, we first consider whether the South Carolina statute contravenes the Twenty-Sixth Amendment by conditioning access to "no excuse"

absentee-by-mail voting on age. For the reasons that follow, we hold that it does. Construing the Twenty-Sixth Amendment in harmony with the Constitution's other voting rights amendments, we find that the unequal allocation of voting access based on age constitutes an abridgement of Plaintiffs' right to vote.

A.

The text of the Twenty-Sixth Amendment is direct. It provides that "[t]he right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by the United States or by any State on account of age." U.S. Const. amend. XXVI, § 1. Ratified in 1971, the Amendment followed the Supreme Court's decision in *Oregon v. Mitchell*, 400 U.S. 112 (1970) (per curiam), which curtailed Congress's attempt to lower the voting age by statute in the Voting Rights Act Amendments of 1970. In response, Congress adopted a constitutional rule governing age-based voting restrictions, and the states ratified it with unusual speed. 85 Stat. 829 (1971); David C. Huckabee, *Ratification of Amendments to the U.S. Constitution*, CRS Report No. 97-922, at 1 (Sept. 30, 1997), https://www.everycrsreport.com/reports/97-922.html; https://perma.cc/FXP5-MTUE (last visited, May 19, 2026).

But although the immediate purpose of ratifying the Twenty-Sixth Amendment was to uniformly lower the voting age to eighteen, "the language of the Amendment 'transcend[s] the particular controversy which was the immediate impetus for its enactment.'" *Tully v. Okeson*, 78 F.4th 377, 383 (7th Cir. 2023) (quoting *Rice v. Cayetano*, 528 U.S. 495, 512 (2000)). "As with the Fifteenth, Nineteenth, and Twenty-Fourth Amendments, the Twenty-Sixth Amendment 'provide[s] an individual right to be free from the denial or abridgement

of the right to vote based on the classification described in the Amendment.'" *Id.* (quoting *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 184 (5th Cir. 2020)).

Here, Plaintiffs do not claim that South Carolina's absentee-by-mail scheme *denies* them the right to vote, but instead only that it unconstitutionally *abridges* that right. To evaluate Plaintiffs' claim, therefore, we must first determine what constitutes an impermissible abridgement of the right to vote under the Twenty-Sixth Amendment.

That inquiry does not take place in a vacuum. Instead, Congress evinced clear intent that the Twenty-Sixth Amendment should be construed in harmony with the Constitution's other voting rights amendments. *Cf. Tully*, 78 F.4th at 382; Vikram David Amar, *Taking (Equal Voting) Rights Seriously: The Fifteenth Amendment as Constitutional Foundation, and the Need for Judges to Remodel Their Approach to Age Discrimination in Political Rights*, 97 Notre Dame L. Rev. 1619, 1620–31 (2022).

Most obviously, in drafting the Twenty-Sixth Amendment, Congress adopted the same operative text used in the Fifteenth, Nineteenth, and Twenty-Fourth Amendments: "the right . . . to vote . . . shall not be denied or abridged . . . on account of" a prohibited ground. U.S. Const. amends. XV, XIX, XXIV, XXVI. That textual choice is significant. When the Constitution uses the same language across related provisions, courts interpret that language consistently absent a reason to depart. *Atlantic Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433 (1932) ("There is a natural presumption that identical words used in different parts of the same act are intended to have the same meaning."); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts*

170 (2012) ("A word or phrase is presumed to bear the same meaning throughout a text . . . ."); *cf. Azar v. Allina Health Servs.*, 587 U.S. 566, 576 (2019).

Moreover, contemporaneous evidence from 1970 and 1971 shows that choice was not made by accident. Indeed, the House Committee on the Judiciary expressly acknowledged that "[t]he language of the proposed" Twenty-Sixth Amendment "parallel[ed]" the previous voting rights amendments and "contemplated" that it would "be construed as comparable in scope to the Fifteenth Amendment and the Nineteenth Amendment." H.R. Rep. 92-37, at 7 (1971); *see also* S. Rep. No. 92-26, at 2 (1971). Individual members of Congress echoed that understanding, placing youth enfranchisement in the same historical lineage as women's suffrage and racial equality in voting. *See* 117 Cong. Rec. 7534 (1971) (statement of Rep. Poff) ("Just as the 15th amendment prohibits racial discrimination in voting and just as the 19th amendment prohibits sex discrimination in voting, the proposed amendment would prohibit age discrimination in voting, but only against those citizens who are 18 years of age or older."); *id.* ("[The proposed amendment] does not grant the right to vote to all citizens 18 years of age or older. Rather, it guarantees that citizens who are 18 years of age or older shall not be discriminated against on account of age . . . the proposed amendment would protect not only an 18-year-old, but also the 88-year-old."); 117 Cong. Rec. 7539 (1971) (statement of Rep. Pepper) ("What we propose to do in the Federal enfranchisement of those 18, 19, and 20 years of age is exactly what we did in enfranchising [blacks and formerly enslaved persons] with the 15th amendment and exactly what we did in enfranchising women country with the 19th amendment.")

And significantly for our interpretive purposes, past Supreme Court cases have used precedent interpreting one voting rights amendment to interpret the scope of another voting rights amendment. *See, e.g.*, *Harman v. Forssenius*, 380 U.S. 528, 542 (1965) (relying on a Fifteenth Amendment case, *Lane v. Wilson*, 307 U.S. 268, 275 (1939), to interpret the Twenty-Fourth Amendment).

For all these reasons, the Twenty-Sixth Amendment's text, structure, and history demonstrate its purpose to place age-based restrictions on adult citizens' electoral participation within the same family of constitutional prohibitions as other forbidden bases for denying or abridging the right to vote. That placement counsels interpreting the Twenty-Sixth Amendment *in pari materia* with the other voting-rights amendments.

B.

1.

So, what do these voting rights amendments mean? The Supreme Court has considered this question most extensively in interpreting the Fifteenth Amendment.[6] And these cases make clear that the purpose of the Fifteenth Amendment was to prohibit the abridgment or denial of any individual's right to vote on the basis of the classifications protected by that amendment—race, color, and previous condition of servitude.

---

[6] The Fifteenth and Twenty-Fourth Amendments have generated a more developed body of case law interpreting the "deny or abridge" formulation. By contrast, the Nineteenth Amendment has comparatively less judicial exposition and thus provides fewer direct doctrinal guideposts for applying that shared language. That difference in doctrinal principle does not detract from the main principle, which is that federal courts have long read the text of these amendments *in pari materia*.

In *United States v. Reese*, 92 U.S. 214, 217 (1875), for instance, the Supreme Court explained that the Fifteenth Amendment "prevents the States, or the United States, . . . from giving preference, in [voting], to one citizen of the United States over another on account of race, color, or previous condition of servitude." This Amendment, the Court explained, created "a new constitutional right": "exemption from discrimination in the exercise of the elective franchise" based on these protected characteristics. *Id.* at 218.

The Supreme Court described the scope of the Fifteenth Amendment in similar terms in *Rice v. Cayetano*, 528 U.S. 495, 512 (2000), explaining that "[t]he design of the Amendment is to reaffirm the equality of races at the most basic level of the democratic process, the exercise of the voting franchise." By embodying that equality principle and prohibiting racial discrimination in voting, the Amendment imposed what the Court described as a "mandate of neutrality." *Id.*

The Court explained the application of this principle as it applies to abridgement of the right to vote in *Reno v. Bossier Parish School Board*, 528 U.S. 320 (2000). Determining whether a voting practice abridges the right to vote "necessarily entails a comparison" to "some baseline" to determine whether it passes constitutional muster. *Id.* at 334. That case involved preclearance proceedings under Section 5 of the Voting Rights Act of 1965. *See* 52 U.S.C. § 10304. In such proceedings, states were required to receive federal approval before changing their voting procedures. Because this context "uniquely deal[s] only and specifically with *changes* in voting procedures," the Court explained that the appropriate "baseline" for abridgement analysis is "the status quo that is proposed to be changed." *Bossier Parish*, 528 U.S. at 334. In other words, the correct comparator

under Section 5 is temporal: a court must compare a group's status under the proposed law to that same group's status under the pre-existing legal framework. Unless the group is worse off, there is no Section 5 violation.

The Fifteenth Amendment is different. In the context of the Fifteenth Amendment, the Court explained, the relevant comparison is not temporal; plaintiffs suing under the Fifteenth Amendment need not prove that a voting regulation has made them worse off than they were before. *Id.* at 333–34. Instead, the appropriate baseline in Fifteenth Amendment cases is "what the right to vote *ought to be.*" *Id.* at 334.

2.

We next need to understand what the Court meant by "what the right to vote ought to be." There are two ways to read this concept. One reading is that "what the right to vote ought to be" refers to some sort of Platonic form of the right to vote—a floor below which a state cannot pass. Under this reading, if a legislature infringes that right to vote with respect to a suspect class (race, sex, or age), it has violated the Constitution. But the better reading, we conclude, understands "what the right to vote ought to be" to require equal treatment in voting.

First consider the Platonic-form reading. One might understand "what the right to vote ought to be" to mean protecting some bare minimum voting rights that a state must provide. *Tully*, 78 F.4th at 387 (comparing a state law to "the right to vote . . . as it was intended to be exercised"). For example, one court conceived of the right to vote as simply "the right to register, the right to cast a ballot, and the right to have that ballot counted." *Id.* at 384. So conceived, a person's right to vote is not abridged so long as he has some adequate

means to exercise it. Under that theory, no Plaintiff's "right to vote" in the case before us has been affected because citizens under age sixty-five are able to cast an effective vote in person. *Id.* at 377–78. Although this reading may seem like a commonsense understanding of *Bossier Parish*'s invocation of "what the right to vote ought to be," we reject it. As discussed above, this reading is inconsistent with the Supreme Court's interpretation of the Fifteenth Amendment as an anti-discrimination rule. More fundamentally, it misunderstands the meaning of abridging "the right to vote" in the voting rights amendments.

State governments retain the primary authority to determine the contours of the right to vote, and the voting rights amendments do not change that basic structure or create a freestanding universal "right to vote." *See* U.S. Const. art. I, § 4. However, the amendments do forbid states from administering their voting rules in a discriminatory manner based on a protected characteristic. Shortly after the Fifteenth Amendment was enacted, the Supreme Court recognized as much. *See Reese*, 92 U.S. at 217 ("The Fifteenth Amendment does not confer the right of suffrage upon any one" but "prevents the States . . . from giving preference . . . on account of race."). Thus, when the voting rights amendments use the phrase "the right . . . to vote," they do not identify a fixed target, such as the Platonic form of the right to vote. Instead, the amendments reference the right to vote as it exists under state law.

Against this backdrop, we can understand *Bossier Parish*'s use of the phrase "what the right to vote *ought to be*." Rather than identifying some idealized version of the right to vote, the voting rights amendments still treat a state's voting practices as the baseline "right to vote." The amendments then make clear what a state cannot do: "abridge" those

rights on account of a protected class. Thus, instead of a retrogression analysis—as in Section 5 of the Voting Rights Act—or a Platonic-form analysis, the voting rights amendments create an anti-discrimination framework for assessing abridgement.[7]

Under this framework, even if a regulation does not make voting more burdensome for plaintiffs than it was before—that is, relative to the status quo ante—it may still "abridge" their voting rights under the Fifteenth Amendment if it imposes burdens on them because of a protected characteristic. The Fifteenth Amendment is concerned not only with "retrogression" but also with "discrimination more generally." *Bossier Parish*, 528 U.S. at 334.

C.

Against that backdrop, we consider whether South Carolina's absentee-by-mail rules, which establish different eligibility based on age, constitute an abridgment of Plaintiffs' right to vote. Following the analysis below, we conclude that they do.

[7] This understanding of the term "abridge" is consistent with its usage in the Privileges or Immunities Clause. *See* U.S. Const. amend. XIV, § 1 ("No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States."). There is broad support among constitutional scholars that the Clause constitutionalized the Civil Rights Act of 1866, which "banned racial discrimination with respect to a long list of rights." Christopher R. Green, *Equal Citizenship, Civil Rights, and the Constitution: The Original Sense of the Privileges or Immunities Clause* 43 (2015); *see also* Ilan Wurman, *The Second Founding: An Introduction to the Fourteenth Amendment* 109 (2020); Randy E. Barnett & Evan D. Bernick, *The Original Meaning of the Fourteenth Amendment: Its Letter & Spirit* 216 (2021). "In the terminology of Reconstruction and the Fourteenth Amendment, a law abridged a state law right when it took that right away from only one group of persons." John Harrison, *Reconstructing the Privileges or Immunities Clause*, 101 Yale L.J. 1385, 1388 (1992); *see also id*. at 1422 ("A state abridges [state law] rights when it withdraws them from certain citizens, but not when it alters their content equally for all."). We read the term "abridge" in the voting rights amendments the same way.

1.

As the Supreme Court laid out in *Bossier Parish*, we must first name "what the right to vote *ought to be*"—the baseline against which we compare the South Carolina rules. *See* 528 U.S. at 334. As discussed above, the answer to that question is simple: the right to vote "ought to be" what a state has defined it to be, but administered without discrimination based on a protected characteristic. So, Plaintiffs must have the same access to the ballot provided to the favored group of voters—here, those age sixty-five and over. *Id.* at 334 (explaining Supreme Court's reading of "abridging" as "referring . . . to discrimination more generally"). Voting laws must adhere to the Amendment's "mandate of neutrality" when it comes to age. *Rice*, 528 U.S. at 512. In other words, a voting law cannot make it harder for one group to vote than another because of their age.

Measured against that standard, South Carolina's age-based absentee-by-mail rules plainly fail to pass muster. As Defendants themselves recognize, having the option to cast an absentee-by-mail ballot increases the convenience and ease of voting. That means voting is harder for voters under age sixty-five than those age sixty-five and older—which constitutes an abridgement of the right to vote on the basis of age and contravenes the Twenty-Sixth Amendment.

That South Carolina's voting rules make it meaningfully harder for voters under age sixty-five to vote is only emphasized by the operation of the relevant statute. Beyond the added convenience of voting afforded to older voters, the statute operates as an eligibility switch that changes what a voter younger than age sixty-five must predict, prove, and do to access a lawful method of casting a ballot. Voters aged sixty-five and older qualify by

age alone and may choose absentee-by-mail voting without explanation. Younger voters must fit within an excuse category and, in some cases, substantiate that fit. *See* S.C. Code § 7-15-320(A).

For workers, that includes "written certification" of employment obligations, which introduces dependency on third parties. *Id.* § 7-15-320(A)(1). The certification requirement may require employer cooperation, internal processing, and disclosure that the employee seeks to vote by mail, sometimes in workplaces where that disclosure is unwelcome or could invite retaliation or stigma. Even absent overt hostility, certification can be slow or uncertain for voters with variable schedules, multiple job sites, or nontraditional employment. Voters aged sixty-five and older face none of these conditions.

These burdens predictably fall unevenly. Requirements such as employer certification and advance deadlines are most difficult for voters with inflexible schedules, variable work shifts, limited control over their time, or limited access to administrative support—features that often correlate with hourly or lower-wage work. Not every voter under age sixty-five is affected in the same way, but the voters on whom these burdens fall most heavily are younger than age sixty-five. Meanwhile, the statute categorically exempts older voters from carrying any of these burdens.

The statute's timing rules deepen the disparity. A completed absentee application must be returned by 5:00 p.m. on the eleventh day before the election. S.C. Code § 7-15-330(C). That deadline fixes the point by which younger voters must identify a qualifying reason and assemble any required documentation. But many of the circumstances that make absentee voting necessary are precisely the kinds of conflicts that arise late: a work

schedule changes days before the election; an overtime work shift is imposed after the deadline; childcare arrangements fall through; a family emergency arises; a car fails; severe weather intervenes; or illness makes in-person voting impracticable but falls short of the statute's requirements for invoking its emergency exception. When those events occur after the pre-Election Day deadline, a voter under age sixty-five who encounters a genuine and unavoidable conflict may be left without access to absentee-by-mail voting precisely when it is most needed. Under the statute, older voters are insured against that risk.

Rather than curing the problem, the statute's narrow emergency exception underscores it. It applies only to hospital admission within four days of the election or on Election Day. S.C. Code § 7-15-330(D). It does not account for the ordinary but unavoidable disruptions already mentioned that shape how and when many people can vote. The result is a redistribution of risk. Older voters retain a standing option to vote by mail, while younger voters must anticipate and satisfy eligibility requirements in advance or forfeit that option when circumstances change.

These additional conditions, barriers, and unequal prerequisites make it meaningfully harder for Plaintiffs to vote as compared to voters aged sixty-five and older, and they are more than sufficient to constitute an abridgment that violates the Twenty-Sixth Amendment.

2.

Defendants argue that this case concerns a preferred voting method, not voting opportunity, and that younger voters remain free to vote in person. They also invoke *McDonald v. Board of Election Commissioners of Chicago*, 394 U.S. 802, 807 (1969), for

the proposition that there is no freestanding right to an absentee ballot. But these objections miss the mark for at least two reasons.

We agree with Defendants on this point. As the Supreme Court has long recognized, "[s]tates . . . have broad powers to determine the conditions under which the right of suffrage may be exercised." *Lassiter v. Northampton Cnty. Bd. of Elections*, 360 U.S. 45, 50 (1959); U.S. Const. art. 1, § 4. But that power is not unlimited—states must exercise it "on a nondiscriminatory basis and in accordance with the Constitution." *Carrington v. Rash*, 380 U.S. 89, 92 (1965). And "once the States grant the franchise, they must not do so in a discriminatory manner." *McDonald*, 394 U.S. at 807. The problem here is not that states cannot regulate absentee-by-mail voting—they undoubtedly can. But those regulations must comply with the Constitution, and the Twenty-Sixth Amendment prohibits exactly the type of age-discriminatory regulation at issue here.[8]

For that reason, *McDonald* does not resolve this case in the way Defendants suggest. That case involved a challenge alleging that Illinois's absentee scheme was constitutionally impermissible because pretrial detainees were ineligible to obtain absentee ballots. *Id.* at

---

[8] Defendants cite *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), to argue that Plaintiffs must prove that the state intended to discriminate against them on the basis of their age. *See* Resp. Br. 41. But *Arlington Heights* only applies when a facially neutral statute is challenged as allegedly discriminatory. That is not the case here where the challenged statute facially discriminates on the basis of age. *Cf. Rice*, 528 U.S. at 509, 514–15 (finding a state statute limiting the electorate to "'qualified voters who are Hawaiians'" violates the Fifteenth Amendment on its face because the statute is "neither subtle nor indirect" but "is specific in granting the vote to persons of defined ancestry and to no others"). The Amendment prohibits a voting regulation of this kind without further inquiry because the express age classification is explicitly prohibited by the text of the Amendment. *Cf. id.*

803–05. The Court upheld the scheme, emphasizing that the challenged classifications were "not drawn on the basis of wealth or race," both of which are constitutionally prohibited bases for allocating voting rights under the Fifteenth and Twenty-Fourth Amendments, and explaining that a classification drawn on a constitutionally prohibited basis "would independently render that classification highly suspect and thereby demand a more exacting judicial scrutiny." *Id.* at 807 (internal quotation marks omitted). At the time *McDonald* was decided in 1969, age was not yet a constitutionally prohibited basis for allocating voting access. The Twenty-Sixth Amendment altered that constitutional landscape in 1971.

We do not doubt that South Carolina retains "broad powers to determine the conditions under which the right of suffrage may be exercised," but, as *McDonald* makes clear, once the state makes absentee-by-mail voting available, it may not allocate access to it in a manner forbidden by the Constitution. *Id.* (internal quotation marks omitted). Because the Twenty-Sixth Amendment now prohibits age-based allocation of voting rights, *McDonald*'s reasoning confirms—not undermines—that an age-based allocation of voting access is constitutionally suspect.

Defendants' reliance on *McDonald* therefore misses the point. That decision addressed a scheme not drawn on a prohibited ground. The instant case, by contrast, involves precisely the kind of prohibited classification *McDonald* distinguished. And the state's ability to point to alternative avenues of voting does not cure an age-based abridgment of voting opportunity. *See Harman*, 380 U.S. at 541–42 (rejecting the

argument that Virginia could impose constitutionally impermissible conditions on one voting mechanism merely because voters retained alternative means of casting a ballot).

Defendants further argue that unpredictability affects all voters because voters of any age may face late-breaking conflicts they did not foresee. That is true but beside the point. The Constitution does not require South Carolina to eliminate life's contingencies, but it does forbid South Carolina from allocating the consequences of those contingencies on unequal terms based on age as they relate to voting access. Under this scheme, when life circumstances change after the statutory deadline, absentee-by-mail voting functions as a form of insurance for voters age sixty-five and older against unforeseen contingencies that might otherwise prevent their participation, while younger voters remain exposed to the risk that such contingencies will preclude them from voting. S.C. Code §§ 7-15-320(B)(2); 7-15-330(C), (D). This contravenes the Twenty-Sixth Amendment.

Finally, Defendants invoke administrability and election integrity to justify the statute. Those are legitimate interests. But the Twenty-Sixth Amendment unconditionally removes age-based allocation of voting opportunity from the set of permissible means without consideration of the state's interests. A state may pursue those interests lawfully—through age-neutral rules, or by limiting absentee-by-mail voting altogether. What it may not do is grant one class of adult citizens unconditional access to a voting method while denying it to another solely because of age.

3.

We recognize that two of our sister circuits have found that similar age-discriminatory absentee-by-mail laws do not violate the Twenty-Sixth Amendment. *See*

*Tex. Democratic Party*, 978 F.3d 168 (5th Cir. 2020); *Tully*, 78 F.4th 377 (7th Cir. 2023). But, with respect, we think those decisions reached the wrong results by applying the wrong analysis.

In *Texas Democratic Party*, the Fifth Circuit held "that an election law abridges a person's right to vote for the purposes of the Twenty-Sixth Amendment only if it makes voting *more difficult* for that person than it was before the law was enacted or enforced." 978 F.3d at 190–91. But as the Supreme Court has explained, the Fifteenth Amendment (and the other voting rights amendments) "ha[ve] never been read to refer only to retrogression." *Bossier Parish*, 528 U.S. at 333. The Court there specifically recognized that "Fifteenth Amendment proceedings . . . involve *not only changes* but (much more commonly) [challenges to] the status quo itself." *Id.* at 334 (emphasis added). As a result, the Supreme Court specifically explained that while retrogression is the baseline for cases brought under Section 5 of the Voting Rights Act, the voting rights amendments apply to "discrimination more generally." *Id.* By nonetheless adopting and applying a retrogression standard, the Fifth Circuit incorrectly narrowed the scope of the Twenty-Sixth Amendment.

The Seventh Circuit in *Tully* recognized that retrogression is not the correct standard for a Twenty-Sixth Amendment challenge. *See* 78 F.4th at 387 ("Whether [the challenged law] has a retrogressive effect, i.e., whether it renders the Plaintiffs 'worse off,' is *not* the equivalent of asking whether their right to vote has been abridged."). But the court went on to define the baseline as the imposition of a "material requirement" that interferes with an individual's right to register to vote, cast a ballot, and have that vote counted. *Id.* at 384, 386. And relying on *McDonald*, the court distinguished "the right to vote from 'a claimed

right to receive absentee ballots.'" *Id.* at 383 (quoting *McDonald*, 394 U.S. at 807). After careful analysis of other ways to vote afforded by the challenged statute—in-person voting on election day, early voting, and for-cause absentee voting—the court decided that the absentee ballot restrictions did not meaningfully burden the plaintiffs' right to vote. *See id.* at 387–88.

As already explained, *supra* Part IV.B.2, we think this is the wrong baseline against which to measure the challenged law. Under *Bossier Parish*, Plaintiffs' voting rights may be "abridged" even if South Carolina's "accommodation of the elderly" does not make the Plaintiffs any worse off than they would be without that accommodation. *See id.* at 387; *Bossier Parish*, 528 U.S. at 333–34. Instead, the voting rights amendments prohibit "discrimination more generally," 528 U.S. at 334, preventing states "from giving preference [in voting] to one citizen . . . over another on account of" the protected characteristics—here, age. *Reese*, 92 U.S. at 217. The Twenty-Sixth Amendment was passed to "reaffirm . . . equality" and impose a "mandate of neutrality" on rules that govern voting on the basis of age. *See Rice*, 528 U.S. at 512. That stated equality principle is the proper baseline.

Because the challenged South Carolina rules make it harder for voters under age sixty-five to vote as compared to voters aged sixty-five and over, they explicitly and impermissibly abridge Plaintiffs' right to vote on the basis of age in violation of the Twenty-Sixth Amendment. And once again, *McDonald* is inapposite—no one here argues that Plaintiffs have a freestanding right to an absentee ballot. The issue instead is that the state discriminatorily regulates the exercise of the franchise on a basis the Constitution expressly

prohibits. *See McDonald*, 394 U.S. at 807; *Carrington*, 380 U.S. at 92 ("[T]he privilege to vote in a state is within the jurisdiction of the state itself, to be exercised as the state may direct, and upon such terms as . . . may seem proper, *provided, of course, no discrimination is made between individuals, in violation of the Federal Constitution*." (emphasis added)).

Accordingly, South Carolina's absentee-by-mail scheme impermissibly abridges the right to vote on account of age. By granting voters aged sixty-five and older unconditional access to absentee-by-mail voting while conditioning that same option for younger voters on eligibility categories, documentation, and a rigid deadline, the state allocates voting opportunities unequally based solely on age. We therefore reverse the district court's denial of Plaintiffs' Twenty-Sixth Amendment claim.

V.

Finally, we take up Plaintiffs' Equal Protection Clause challenge to the age-based absentee-by-mail voting rules. Here, the district court first considered whether to apply rational basis review or the Supreme Court's *Anderson-Burdick* balancing test to adjudicate Plaintiffs' claim. *See Grant v. Knapp*, 2025 WL 1145042, at *7–8 (D.S.C. Mar. 27, 2025). The district court concluded that rational basis review applied, but it determined that Plaintiffs' challenge would fail under either standard of review. *Id.* at *8–9.

On appeal, Plaintiffs do not contest the district court's finding that their Equal Protection claim would fail under both rational basis review and the *Anderson-Burdick* test. Instead, they argue only that the challenged voting rules are subject to strict scrutiny, and that the state cannot justify them under that test. *See* Opening Br. 30–33. But while the

law facially discriminates against Plaintiffs on the basis of age, the Supreme Court has unequivocally held that "age is not a suspect classification under the Equal Protection Clause." *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 83 (2000). Plaintiffs' Equal Protection challenge thus fails on that ground alone. And because Plaintiffs have not tried to show that the challenged rules fail the rational basis test or the *Anderson-Burdick* balancing test, we need not further address the district court's analysis under those standards.

On that basis, we affirm the grant of summary judgment to Defendants on Plaintiffs' Equal Protection claim.

VI.

Pursuant to the foregoing, we affirm the district court's judgment on Plaintiffs' Equal Protection claim, reverse the district court's judgment on Plaintiffs' Twenty-Sixth Amendment claim, and remand for further proceedings consistent with this opinion. On remand, the district court should determine the appropriate remedy for the Twenty-Sixth Amendment violation we have identified—either extending the benefit of "no excuse" absentee-by-mail voting to voters under age sixty-five, or removing the benefit provided to voters age sixty-five and older. *See Rose*, 361 F.3d at 790; *Heckler*, 465 U.S. at 738–39. We leave questions about the timing of a remedy to the district court in the first instance, recognizing that "considerations specific to election cases" counsel against court-ordered remedies that might cause voter confusion when elections are imminent. *See Purcell*, 549 U.S. at 4.

*REVERSED IN PART, AFFIRMED IN PART, AND REMANDED*